The **OHIO CASUALTY INSURANCE CO.**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 396–84C.

United States Claims Court.

July 9, 1987.

David C. Romm, Vienna, Va., for plaintiff. Kathleen Kemby, of counsel.

Kathleen Shahan, with whom was Asst. Atty. Gen., Richard K. Willard, Washington, D.C., for defendant. Alex Barna, Dept. of Navy, of counsel.

## OPINION

SMITH, Chief Judge.

This is an action between a Miller Act performance and payment bond surety and the United States. Plaintiff, the Ohio Casualty Insurance Co. (OCIC) alleges that the United States abused its discretion in failing to terminate a government contractor, Kon-Struct-All, Inc. (KSA) prior to August 1981. It further claims that the government owed it an equitable duty as a surety, and in abusing its discretion the government violated that equitable duty.

The court has heard the evidence presented at trial and made the following determinations. While it is not the role of a judge to second guess a contracting officer in the broad discretion granted to that agent of the executive branch, such discretion is not without limits. The area of construction management clearly requires a highly specialized expertise; perhaps even "a feel for the job." On site determinations should only be found to be abuses of discretion in extreme cases. This, however, is one of those extreme cases as the evidence has clearly demonstrated.

■ The Court of Appeals for the Federal Circuit held in *Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed.Cir. 1985), that an equitable obligation was owed to the surety by the government. A surety contracts to and is paid for protecting against the risks of contractor nonperformance. The Miller Act has determined this is an important public function. The surety does not, however, contract to assume the risks of unreasonable conduct by a contracting officer which results in a loss to the government. To interpret the surety relationship otherwise would be to significantly raise insurance costs to the government in the long term, to encourage sloppy government procedures, and to ultimately undercut the rationale for the Miller Act.

In this case the evidence overwhelmingly showed a pattern of unreasonable conduct on the part of those responsible for the administration of the contract with KSA. An admittedly, irresponsible, dishonest, incompetent, and abusive contractor was allowed almost three years and $2,680,662.70 to only partially complete a job that should have by the Navy's own estimates been fully completed in nine months at a total cost of $2,594,000. While it is not this court's function to say whether the fault lies with individual Navy officials or with an overloaded and overly bureaucratic system it would be manifestly unjust to make the surety pay for the Navy's mistake.

The evidence clearly supports a finding that the contractor in this case should have been terminated no later than November of 1981 and that it was an abuse of the contracting officer's discretion to not do so. In so abusing its discretion, the Navy violated an equitable duty it owed to plaintiff. The evidence also supports a finding that the plaintiff suffered financial losses of $592,687.81 as a result of the government's failure to terminate by such date.

### Facts

■ The court based on the stipulated facts submitted by the parties and the testimony and evidence at trial has made the following detailed findings of fact in support of its decision that the government abused its discretion in failing to terminate its contract with the contractor, KSA prior to November 1981.

On September 28, 1979, the Navy entered into a contract with KSA in the amount of $2,594,000.00 for the construction of five "customized" steel buildings at the Naval Petroleum Reserve No. 1 located at Elk Hills Field, Tupman, California (the Project). A completion date was set for June 9, 1980. The performance and payment bond on the contract were issued by OCIC.

In January 1980, prior to any work being started, KSA submitted to the Navy a Value Engineering Change Proposal (VECP), later known as Modification 8 (Mod. 8)

which requested the customized steel buildings be changed to standardized steel buildings. This change was supposed to reduce costs by $160,000.

In June 1981, a year after the original completion date, the Navy acquiesced to the VECP not because KSA was really entitled to additional time and money, but because the Navy felt it might have acted improperly in the initial procurement of the contract by negotiating with KSA prior to the award. During the period from January 1980 through June 1981, OCIC was aware there were problems with the project and was hopeful that the Navy and KSA could resolve the problems. During that period KSA's performance had been either unacceptable or nonexistent. By February 1980 although 50 percent of the contract time had elapsed, KSA had made little construction progress. KSA was requesting additional time to complete the project, because extensive revisions in the project drawings would be required, as a result of the VECP proposal. In March 1980 the Navy stated there would be no additional time allowed for preparation of the VECP, but that additional time might be allowed as a result of changes in the work.

On May 15, 1980, KSA submitted a revised VECP, requesting a 120-day time extension and now estimating cost savings at only $49,620. The Navy was still not satisfied with the proposal, because several key submittals that it had requested were missing. The Navy also expressed concern to KSA over its decision to halt all work on the project pending approval of the VECP and suggested that KSA work in areas that weren't affected by the proposed VECP. KSA told the Navy that further progress must await approval of the VECP. The Project Report indicates no construction work was performed from May 23, 1980 to July 28, 1980. On June 17, 1980, KSA withdrew the VECP. At a meeting in July, between KSA and the Navy, KSA agreed to proceed with the VECP and stated it would forward a final estimate of cost savings and its request for additional time.

At a meeting between the Navy and KSA on August 13, 1980, KSA stated it should be reimbursed for all the costs it incurred implementing the VECP. The Navy refused to agree to this request. On August 18, 1980, the Navy wrote KSA that the August 11, 1980, adjusted completion date had passed and that liquidated damages may be assessed at the rate of $250 per day, commencing August 12, 1980.

On September 9, 1980, KSA wrote to the Navy and made the following requests due to the proposed VECP: (a) 225-day extension; (b) $297,423.09, and (c) release of additional monies upon approval of the request. On September 17, 1980, the Navy informed KSA that a Department of Defense Contract Pricing Proposal (Form DD 633) must be submitted for change orders in excess of $100,000. KSA, although repeatedly requesting its advance, did not submit a Form DD 633 until October 23, 1980.

For the next eight months there were discussions back and forth between the Navy and KSA over Mod. 8 with little or no work being performed. The Navy also became aware during this period that KSA was having payment disputes with some of its subcontractors. Mod. 8 was eventually signed on June 5, 1981, with the Navy acquiescing to most of KSA's demands.

Mod. 8 as well as *increasing* the contract price by $840,000.00, extended the completion date to December 15, 1981. The court attempted to determine from the witness, Mr. Sabbadini, why Mod. 8 ultimately increased the contract price by $840,000 rather than decreasing it by $160,000, a $1,000,000 cost increase. His explanation was that it took a long time to finalize the VECP and KSA was forced to incur substantial costs because of the 18 month delay. Mr. Sabbadini initially blamed the excessive delay on "... an unsophisticated contractor who was not familiar with dealing with the Navy and the Navy's procedures." Transcript, p. 712.

If the delay was caused by the contractor's incompetence and failure to supply needed data and the Navy system allowed this to ultimately increase the contract cost by $1,000,000, the Navy's contract system is seriously flawed and the award of Mod. 8

to an incompetent contractor which created its own problems, is highly questionable. If on the other hand, the 18-month delay in implementing the VECP was the Navy's fault, and this delay caused an increase in the contract cost of $1,000,000, the Navy's own system has imposed costs upon this contract which the surety should not bear.

Mr. Sabbadini, the principal official involved in managing this contract for the Navy, was unable to assist the court in clarifying the issue:

> THE COURT: ... I'm just suggesting if that 840,000 in an ideal system shouldn't have occurred, those expenses should never have been incurred, I'm trying to find out who was at fault. Was it that the Navy system was so bad that Mr. King couldn't get answers and, therefore, went—turned into a ranter, driven to the point of being crazy, or was it that Mr. King was such an incompetent contractor that the Navy system was one he could never adapt to and never adjust to, in which case it then becomes difficult to understand why he was able to get the 840,000.
>
> THE WITNESS: I don't know if I've got an answer for you, Your Honor.

Tr., pp. 714–15.

OCIC was notified of Mod. 8 after it was signed and would not consent to it because KSA refused to agree to its requirement of joint control over the disbursement of contract funds. On June 25, 1981, the Navy issued a check to KSA for $429,274.00 against Mod. 8. The Navy was aware there were problems with obtaining OCIC's approval, but failed to withhold any retainage on the payment.

Upon the signing of Mod. 8, both the testimony and stipulated fact 148 showed that the Navy expected KSA's contract performance to improve immediately and dramatically. Through the summer of 1981, KSA performed little or no work and the Resident Officers in Charge of Construction (ROICC) officials, by September 1981, were advocating termination. The Navy was aware that KSA depended entirely on its subcontractors/suppliers for job progress and there were numerous complaints by those subcontractors/suppliers that they were not being paid. Because of these problems, the Navy in October 1981 sent KSA a "cure letter" which required them to demonstrate their capacity and intent to complete the job. KSA never fully or adequately responded to the letter.

On November 9, 1981, the Navy met with OCIC to discuss KSA's lack of performance. At this time, OCIC requested that the Navy get tough with KSA and withhold any future progress payments. This request was put in writing by letter to the Navy dated November 13, 1981.

One day after the meeting with OCIC the Navy met with KSA to discuss the cure letter. OCIC was not invited to this meeting. KSA's principal acted irrationally at that meeting and stormed out of the room without agreeing to meet any of the Navy's demands. At about this time the entire ROICC office was openly advocating default termination because of KSA's poor performance, untrustworthiness, and total unwillingness to cooperate with the Navy in any of its demands. The next person in the chain of command, Mr. Sabbadini vetoed this recommendation and never passed it along to Mr. Wynn, who had the authority to recommend termination to the Naval Facilities Engineering Command (NAVFAC). Mr. Wynn testified that he would have gladly terminated KSA in November 1981, if he could have.

The system in use by the Navy, allowed the veto of one person in a mid-level position to block the termination. Mr. Sabbadini was applying what was referred to as the "warm body" policy and Mr. Wynn testified he also supported this policy. Under this policy termination would not be recommended as long as the contractor had at least one warm body on the site.

From November 1981 through February 1982, KSA's work improved somewhat, although it was still poor. But by March 1982, most of the subcontractors had walked off the job because they were not getting paid. Without any subcontractors it was obvious to everyone that KSA would be unable to complete the job. They were terminated in June 1982. C.R. Frederick

took over the project in late August 1982 and finished in November 1982. C.R. Frederick completed the project in less time and for less money than KSA said it needed for completion.

The facts found clearly support a conclusion that the Navy violated its equitable obligations to the surety as set out in *Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed.Cir.1985). Most of the eight tests set forth in *Balboa* are satisfied in the plaintiff's favor.

### Discussion

The plaintiff finds arbitrary and capricious conduct on the part of the government in failing to terminate this contractor, and in implementing a contract management system so flawed that it was incapable of protecting the surety's equitable rights. These two theories are really different ways of looking at the same underlying action and will be treated under the same criteria.

These criteria were recently enunciated by the United States Court of Appeals for the Federal Circuit in *Balboa*. As discussed in *Balboa*, the burden of proof required of a surety in a claim for abuse of discretion is heavy, *Royal Indemnity Co. v. United States*, 208 Ct.Cl. 809, 823, 529 F.2d 1312, 1320 (1976), but that does not mean the government has unlimited discretion, or that the burden cannot be borne. The government must take into account the interests of the surety in wielding its discretion. *Argonaut Ins. Co. v. United States*, 193 Ct.Cl. 483, 495, 434 F.2d 1362, 1368 (1970).

In order to determine whether the government has abused its discretion in distributing funds, we must look at the eight factors the *Balboa* court has determined are important.

### 1. Balboa Factors

*1. Attempts by the Government after notification by the surety, to determine that the contractor had the capacity and intent to complete the job.*

The government from the time the contract was awarded should have been aware

KSA lacked the capacity and intent to complete the job. The facts show that when KSA was terminated in June 1982, it had gone two years past the original completion date and had failed to complete the work. It was also made clear through the testimony that KSA's attitude toward the government was one of open hostility.

By November 1981, when OCIC requested the Navy get tough with KSA or terminate, it was clear to everyone but Mr. Sabbadini that termination was appropriate. On November 2, 1981, the Navy prepared a document supporting a default termination, but never finalized it and instead gave KSA another chance. As previously discussed, the Navy met with KSA in mid-November and KSA acted abusive and irrational at that meeting. OCIC sent the Navy a letter dated November 13, 1981, (Plaintiff's Exhibit 95) requesting the Navy stop progress payments, but the Navy continued to make payments to KSA.

*2. Percentage of contract performance completed at the time of notification by the surety.*

At the time Mod. 8 was signed in June 1981, the government contends the contract was 50 percent complete and the plaintiff contends KSA had only completed 20 to 30 percent of the work-in-place. The discrepancy exists because the government included in its percentage, payment for materials purchased and stored on site, whereas plaintiff only included work-in-place completed. By June 1981, KSA had expended twice the original contract time to do less than one-half the work. From June 5, 1981 through November 1981, the parties have stipulated there was very little productive construction work, therefore the percentage of work completed was low, especially when factored in with the amount of time that had elapsed since the start of the project.

*3. Efforts of the Government to determine the progress made on the contract after notice by the surety.*

This factor is very similar to the two factors, previously discussed. An analysis of whether the contractor had the capacity and intent to complete the job, as well as

the percentage of contract completion involves determining the progress made on the contract. The surety in November 1981 requested the Navy get tough with KSA and terminate, if progress did not improve. There was no noticeable improvement and it was obvious to everyone that KSA would be unable to complete the project by the December 1981 completion date. There was testimony that from November 1981 to March 1982 when KSA abandoned the project, there was marginal improvement but nowhere near enough to get the project completed. During this time period, KSA's performance was still worse than all the other contractors at Elk Hills.

*4. Whether the contract was subsequently completed by the contractor (not conclusive, but relevant to show the reasonableness of the contracting officer's determination of the progress on the project).*

The contractor had effectively abandoned the project in March 1982. The events leading up to the abandonment made it clear to the majority of the witnesses and to the court that KSA never had the capacity to complete the project.

*5. Whether the payments to the contractor subsequently reached the subcontractors and materialmen (this goes to the equitable obligation of the Government to subcontractors and others to see that they will be paid; also because the surety is liable to the subcontractors, any money that reaches them furthers the objectives of the surety as well as those of the Government).*

The Navy between March 1980 and June 1982 received at least 81 complaints from KSA's subcontractors/suppliers that they were not being paid. The Navy referred these complaints to the surety and prior to 1982 only one complaint was formally filed with the surety.

The testimony from Navy officials was that they did not believe they had an equitable obligation to the subcontractors and although they did discuss the problem with KSA, they took no steps to assure the subcontractors were paid. The Navy continued to make progress payments to KSA and did not investigate the fact that most of the payments were being deposited into the personal accounts of KSA's principals, Bob and Lou King.

*6. Whether the Government contracting agency had notice of problems with the contractor's performance previous to the surety's notification of default to the Government.*

The Navy was aware of the contractor's problems with performance throughout the entire period of the contract. The government, as well as the surety was hoping the problems could be resolved. It wasn't until November 1981 that the surety first suggested to the Navy that it get tough with KSA or terminate, even though there were obvious problems prior to that time. In fact, substantial evidence exists in the court's view that signing Mod. 8 rather than terminating KSA was unreasonable, in June 1981. This conclusion, however, is unnecessary to the decision of this case and the plaintiff does not argue it.

*7. Whether the Government's action violates one of its own statutes or regulations.*

While the record is replete with incidents of violations, these violations involve provisions of the contract and official Navy policy, rather than statutes or regulations. These violations, although not of statutes and regulations, indicate a disregard for the equitable duty owed to the surety. They include failure to require as provided in the contract, that 20 percent of the work at the job-site be performed by the contractor, unless waived in writing by the contracting officer; failure to require KSA to have a full-time, competent superintendent on the job-site at all times; failure to obtain written consent from the surety for the contract modification in excess of $25,000; and failure to terminate as provided for in the NAVFAC contracting manual, when it became obvious that the contractor was unable to complete the work within the time specified in the contract.

*8. Evidence that the contract could or could not be completed as quickly or cheaply by a successor contractor.*

The evidence showed that the contract was completed by another contractor in approximately four months and for less money than the remaining contract balance. Although this is a hindsight test, it indicates an abuse of discretion by the government for failing in the fall of 1981 to do a cost benefit analysis on the replacement of KSA.

## II. Termination Date

The plaintiff has argued that the contract could have been terminated *ab initio*. Although there are certain factors which support this position, the court must keep in mind the strong interest of the Navy in getting the job completed, as well as OCIC's acquiescence to the situation prior to November 1981.

By mid-November 1981 events had occurred which made the Navy's failure to terminate inexcusable. On October 23, 1981, the Navy issued a "cure letter" which demanded action by KSA within 10 days. KSA failed to respond to this letter. A meeting was held between the surety and the Navy on November 9, 1981, at which time the surety requested the Navy get tough with KSA or terminate. The surety followed this up with a letter requesting the Navy withhold progress payments to KSA. On November 10, 1981, the Navy met with KSA in hopes of getting them to make some promises regarding completion. The meeting failed to accomplish anything and left most Navy officials with the feeling KSA would be unable to complete the job. There is no question at this point that it was unreasonable not to terminate KSA.

## III. The Navy System

The facts as applied to the *Balboa* criteria clearly show that the defendant abused its discretion by failing to terminate KSA prior to mid-November 1981. The facts in conjunction with the *Balboa* criteria also reveal obvious inadequacies in the Navy's system at this point. As previously discussed, the negotiation of Mod. 8 which instead of decreasing the contract price by $160,000 as originally promised, increased it by $840,000. The Navy's explanation for this $1,000,000 difference was and is incomprehensible. So were its reasons for not terminating KSA prior to mid-November 1981, when everyone but one mid-level official was recommending termination. It is impossible to fairly evaluate a worldwide multi-billion dollar system on the basis of one construction contract gone awry. Further, a court is a very poor institution for suggesting or even identifying areas needing administrative reform. The Navy contract management system is *not* on trial in this case. However, it is this court's duty to identify in this case whether the system functioned improperly. With the benefit of hindsight the court can say it did function improperly. Whether this is an isolated aberration or a systemic problem is up to the Navy and the Congress to determine.

## Damages

The plaintiff offered unrebutted evidence indicating the cost to complete the project, if KSA had been terminated in mid-November 1981, would have been $632,074.98, leaving a contract balance of $910,587.90. This amount would have covered plaintiff's damages which are a direct result of defendant's failure to terminate KSA prior to mid-November 1981. The damages are as follows: $415,188.94 paid to subcontractors and suppliers; $25,456.67 miscellaneous expenses; $152,042.20 attorney's fees; for a total of $592,687.81.

## Conclusion

Based upon the entire record, the court concludes that the defendant abused its discretion by failing to terminate KSA prior to mid-November 1981.

The clerk is directed to enter judgment for the plaintiff in the amount of $592,-687.81, plus interest, as provided in the contract between KSA and the Navy (P.L. 92–41, 85 Stat. 97) from August 2, 1984, until the entry of judgment. Costs awarded to plaintiff.