**PEERLESS INSURANCE COMPANY, Plaintiff,**

v.

**UNITED STATES of America, John F. Lehman, Secretary of the Navy, Defendant.**

**Civ. A. No. 87–0084–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Dec. 7, 1987.

Michael J. Cohen, Richard W. Schwartzman, Braude & Margulies, P.C., Washington, D.C., for plaintiff.

Paula M. Potoczak, Asst. U.S. Atty., Office of the U.S. Atty., Alexandria, Va., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

## I. INTRODUCTION

Plaintiff, Peerless Insurance Company (Peerless), seeks a declaratory judgment that it is not liable to the United States as surety on a bid bond. The United States has filed a counterclaim for $419,000, the amount allegedly owed by Peerless under the bid bond. For the reasons stated in this opinion, Peerless' declaratory judgment action is dismissed and judgment is awarded to the United States on its counterclaim in the amount of $419,000.

## II. FINDINGS OF FACT[1]

1. On or about July 24, 1985, the Naval Facility Engineering Command (NAVFAC) issued Invitation for Bid (IFB) No. N62472–84B–0545. This IFB was for a contract to repair the aircraft ramp area at the Naval Air Facility, Detroit, Mt. Clemens, Michigan.

2. The IFB was set aside for 100% small business participation, *see* 15 U.S.C. § 644 (1976 & Supp.1987), required all bidders to submit a 20% bid bond, and provided for a sixty-day bid acceptance period wherein all bids were to remain in effect for a sixty-day period from the date of bid opening.

3. On or about August 29, 1985, the bids were opened. There were five bids in all, ranging in price from $2,095,000 to $3,094,750. Vitoangelo Contracting, Inc. (Vitoangelo) was the low bidder on the project at $2,095,000, Dependable Contractors, Inc. (Dependable) was the second low bidder at $2,298,000, and Artco Contracting, Inc. (ARTCO) was the third low bidder at $2,783,000.

4. With its bid, Vitoangelo submitted a certification that it was a small business concern. Vitoangelo's bid also included a bid bond for 20% of the bid price. Peerless Insurance Company (Peerless) wrote the bid bond and Gus Zervos, Peerless' local agent, signed it on behalf of Peerless. The purpose of the bid bond is to "protect the United States in case the bid is withdrawn or the contractor fails to execute the contractual documents or fails to give a performance bond." *United States v. Maryland Casualty Co.*, 213 F.Supp. 800, 803–04 (E.D.N.Y.1963). Llowell Welnack, in-house counsel for Peerless, testified that the purpose of the bid bond is to guarantee that the principal's contract will not be withdrawn and that the principal will enter into a contract if awarded the bid.

---

1. The findings of fact were made based upon documents and records entered into evidence and the testimony given at trial. The trial took place on Wednesday, September 23, 1987. Those testifying at trial were Margaret Gettings, head of the construction contracting branch of the Navy; Lena Semola, a Navy contract specialist; Llowell Welnack, in-house counsel for Peerless Insurance Company; and Joseph M. Ellis, claims investigator for Peerless.

5. On or about September 3, 1985, ARTCO, the third low bidder, filed a bid protest with the Navy challenging (i) the responsiveness and responsibleness of Vitoangelo, and (ii) the small business qualifications of Dependable. Dolores O'Malley, the government contracting officer, in a letter to ARTCO dated September 12, stated that ARTCO's protest with respect to Vitoangelo was without merit. In addition, O'Malley did not at that time forward ARTCO's protest of Dependable's size to the SBA for a size determination.

6. On or about September 9, 1985, Vitoangelo confirmed its bid. Thereafter, on September 13, 1985, the Navy awarded the contract to Vitoangelo in the amount of $2,095,000.

7. Prior to the September 13, 1985, award, the Navy verified Vitoangelo's bid with the contractor. During a telephone conversation, Vitoangelo and the Navy's representatives discussed the contractor's understanding of the requirements of the contract and his ability to perform the contract. In addition, the Navy discussed Vitoangelo's financial responsibility. As a result of these discussions with Vitoangelo and Gus Zervos, Peerless' local agent, the Navy determined that Vitoangelo was a responsible contractor.

8. On September 23, 1985, Vitoangelo signed the Notice of Contract Award.

9. The contract required the successful bidder to provide performance and payment bonds within 15 days of the award of the contract. Vitoangelo failed to provide these bonds within the 15 days.

10. On or about October 1, 1985, the Navy issued a "cure notice" to Vitoangelo, which stated that unless the contractor provided the requisite bonds within 10 days, the Navy would terminate the contract for default. The Navy sent Peerless a copy of the cure notice.

11. On or about October 3, 1985, the Navy received a letter from Vitoangelo's accountant, dated September 1, 1985, stating that performance and payment bonds would be provided to the Navy by October 15, 1985. Vitoangelo did not provide these bonds. On November 6, 1985, the Navy sent a certified letter to Vitoangelo asking it to "show cause" why the contract should not be terminated for failure to provide the bonds.

12. On November 15, 1985, the Navy received a response to the show cause letter indicating that the bonds could be obtained from Merchants' & Manufacturers' Insurance Company of Cleveland, Ohio. These bonds, however, were unacceptable to the Navy because the insurance company did not hold a certificate of authority for federal bonds.

13. On November 26, 1985, the Northern Division, NAVFAC, recommended default of the Vitoangelo contract to NAVFAC headquarters.

14. On December 3, 1985, the Navy forwarded ARTCO's size protest of the second low bidder, Dependable, to the SBA for determination.

15. On December 4, 1985, NAVFAC headquarters terminated Vitoangelo's contract for failure to provide payment and performance bonds. No demand was made upon Peerless, the bid bond surety, at the time of termination. The Navy then asked the second low bidder, Dependable, if it could perform the contract at its original bid price. On February 3, 1986, Dependable advised the government contracting officer that it would require an increase of $175,450 in order to perform the contract. In light of this increased price, the contracting officer decided to reprocure the now defaulted Vitoangelo contract.

16. On January 14, 1986, the SBA determined that Dependable was a small business. On January 21, 1986, ARTCO appealed the SBA determination to the Board of Contract Appeals.

17. On March 4, 1986, NAVFAC issued IFB No. N–62472–86–B–0061. This IFB was identical to the IFB for the defaulted Vitoangelo contract. Thereafter, on April 4, 1986, the Navy opened the bids for the second IFB. Six bids were received on this reprocurement of the defaulted Vitoangelo contract. Dependable was the low bidder in the amount of $2,473,000. ARTCO was

the second low bidder in the amount of $2,934,577.

18. On April 7, 1986, ARTCO protested, for a second time, the award of the contract to Dependable on the basis of size. At this time, ARTCO's appeal of its original protest as to Dependable's size was still pending at the SBA's Board of Contract Appeals. On April 17, 1986, the Navy forwarded ARTCO's second protest to the SBA for determination.

19. On May 22, 1986, the SBA's Board of Appeals determined that Dependable was a large business. The Navy therefore awarded the contract to ARTCO, the reprocurement second low bidder, in the amount of $2,934,577.

20. ARTCO's bid on the second IFB was $829,577 greater than the Vitoangelo defaulted contract amount, and $147,577 greater than ARTCO's bid on the first IFB.

21. On June 16, 1986, the Navy made a demand for $419,000 from Peerless. The Navy made this demand under the Peerless bid bond written and submitted by Vitoangelo in connection with the defaulted contract. The $419,000 represented 20 percent of the defaulted bid price of $2,095,000. Peerless Insurance Company denied payment under its bid bond on July 10, 1986.

22. On September 30, 1986, the contracting officer forwarded notice of Peerless' refusal to pay to the Navy Comptroller for debt collection action. The contracting officer advised Peerless that she had referred the matter to the Navy Comptroller for collection on October 17, 1986.

23. On October 20, 1986, the Navy Comptroller made his first demand for payment to Peerless. On December 19, a second demand was made and, on January 30, 1987, the Navy Comptroller made his third and final demand for payment. In that demand, the Comptroller advised Peerless that its failure to pay the full amount of the demand could result in its removal from the approved list of sureties at the United States Department of Treasury.

24. ARTCO completed performance of the contract and the Navy paid ARTCO in full.

## III. CONCLUSIONS OF LAW

### A. *Subject Matter Jurisdiction*

Peerless' declaratory judgment action must be dismissed for lack of jurisdiction. Yet dismissal of Peerless' action is not fatal to federal jurisdiction; the United States' counterclaim sets forth independent grounds.

█ This Court lacks subject matter jurisdiction to hear Peerless' declaratory judgment action because it is not, strictly speaking, an "action on a bond." Peerless' asserted basis for jurisdiction is 28 U.S.C. § 1352, which provides that:

The district courts shall have original jurisdiction, concurrent with State courts, of *any action on a bond* executed under any law of the United States (emphasis added).

The issue before the Court is whether Peerless' declaratory judgment action is an "action on a bond" within the meaning of section 1352. It is not. A declaratory judgment action is not an action "on a bond" but rather an action *about* a bond. Title 28 U.S.C. § 1352 does not explicitly provide for declaratory judgment actions against the United States, and Peerless cites no authority in support of its assertion that section 1352 provides this Court with jurisdiction. Absent an express waiver of sovereign immunity, suit cannot be brought against the United States. *See United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Therefore, the Court holds that 28 U.S.C. § 1352 does not provide jurisdiction for declaratory judgment actions concerning bid bonds.

█ In any event, this issue is not determinative of federal jurisdiction because the United States has filed a counterclaim seeking the amount allegedly due under the bid bond. This counterclaim raises essentially the same issue as Peerless' declaratory judgment action, *viz.*, whether Peerless is liable as surety on the Vitoangelo bid bond.

Jurisdiction for the United States' counterclaim is properly premised on 28 U.S.C. § 1345 ("United States as a plaintiff") and

28 U.S.C. § 1352. Therefore, despite the dismissal of Peerless' declaratory judgment action, the Court can adjudicate the United States' counterclaim because an independent basis exists for federal jurisdiction. *See National Research Bureau, Inc. v. Bartholomew,* 482 F.2d 386, 386–88 (3d Cir.1973) (proper for district court to retain jurisdiction after plaintiff's claim dismissed in antitrust action where counterclaim had independent grounds for federal jurisdiction); *see also DHL Corp. v. Loomis Courier Service,* 522 F.2d 982, 985 (9th Cir.1975) (all counterclaims dismissed where none had federal jurisdictional basis independent of complaint).

### B. *Peerless' Standing to Raise Defenses*

Peerless contends that the United States owes Peerless a duty to mitigate damages and that it breached this duty by failing to terminate the Vitoangelo contract on an earlier date. The United States responds that (i) it owes no such duty to mitigate and (ii) if such a duty does exist, Peerless cannot raise defenses against the United States that Vitoangelo, as principal, could not assert; *i.e.,* since Vitoangelo could not claim that the Government should have terminated the contract earlier, Peerless, as surety, cannot raise this defense. The issues before the Court, therefore, are (i) whether the United States owes a duty to Peerless to mitigate reprocurement costs, and (ii) whether Peerless may assert defenses that Vitoangelo could not assert in a suit brought by the government for payment of the bid bond.

Peerless claims that the United States owes a duty to Peerless to mitigate damages and that this duty arises independently of any duty owed to Vitoangelo. In support of its position, Peerless relies chiefly upon *Balboa Insurance Co. v. United States,* 775 F.2d 1158 (Fed.Cir.1985), and *Ohio Casualty Insurance Co. v. United States,* 12 Cl.Ct. 590 (1987). In *Balboa,* plaintiff was surety on Miller Act bonds,

also referred to as "payment and performance" bonds.[2] The surety in *Balboa* informed the government contracting officer that the contractor was in financial straits and would not be able to fulfill its payment and performance obligations. The surety demanded that no further contract funds be released without its consent. The government, however, continued to make payments to the contractor, and the surety brought suit seeking recovery of funds disbursed. The court held that the surety had standing to sue because "a suretyship is a ... three-party agreement and ... a surety, as bondholder, is as much a party to the government contract as the contractor. If the *surety* fails to perform, the government can sue it or the bonds." 775 F.2d at 1160. Thus, the court recognized that the Government owed the surety an equitable obligation.

The *Balboa* court also recognized that although the Government owed a duty to the surety, the Government was entitled to exercise its discretion in overseeing the performance of a contract. *Id.* at 1164 (citing *United States Fidelity & Guaranty Co. v. United States,* 230 Ct.Cl. 355, 676 F.2d 622, 628 (1982)). Yet, with respect to the surety,

> this discretion and flexibility is limited by [the Government's] "duty to exercise its discretion responsibly and to consider the surety's interests in conjunction with other problems encountered in the administration of the contract."

*Id.* (quoting *Argonaut Insurance Co. v. United States,* 193 Ct.Cl. 483, 434 F.2d 1362, 1368 (1970)). The court then set forth eight factors to be applied in determining whether the Government exercised reasonable discretion in distributing funds:

> (1) Attempts by the Government after notification by the surety, to determine that the contractor had the capacity to do the job.

---

**2.** The purpose of Miller bonds is to insure completion of a government contract where the general contractor is in default.

When a contractor defaults under the contract, the obligation of the surety then arises under its performance and payment bonds. When the surety then finances the contract to completion, it is subrogated to the contractor's property rights....
*Balboa,* 775 F.2d at 1161.

(2) Percentage of contract performance completed at the time of notification by the surety.

(3) Efforts of the Government to determine the progress made on the contract after notice by the surety.

(4) Whether the contract was subsequently completed by the contractor.

(5) Whether the payments to the contractor subsequently reached the subcontractors and materialmen.

(6) Whether the Government had notice of problems with the contractor's performance previous of the surety's notification to the Government.

(7) Whether the Government's action violates one of its own statutes or regulations.

(8) Evidence that the contract could or could not be completed as quickly or cheaply by a successor contractor.

In *Ohio Casualty*, the court applied the eight factors set forth in *Balboa* and held that the Government breached its duty to a Miller bond surety. There, the surety brought suit alleging that the United States abused its discretion in failing to terminate a government contractor. The contractor had been two years behind in completion of the contract and had effectively abandoned the project by the time the government terminated the contractor. In addition, the government took no steps to determine whether the payments to the contractor ultimately reached the subcontractors; indeed, most of the payments were being deposited into the personal accounts of the contracting company's owners. The court applied the *Balboa* factors and found that the government abused its discretion by failing to terminate the contractor at an earlier date. *Ohio Casualty*, 12 Cl.Ct. at 594–96.

Peerless asserts that *Balboa* and *Ohio Casualty* are dispositive. The United States, however, claims that these cases are inapposite because they concern Miller bond sureties, not bid bond sureties. In-

deed, not all of the factors set forth in *Balboa* and applied in *Ohio Casualty* are readily applicable in the instant case. They were designed to be applied in Miller performance and payment bond surety cases, not bid bond cases. This, however, is neither dispositive nor especially persuasive on whether a duty to mitigate arises in a bid bond case.

■ There are, it appears, no cases on point concerning bid bond sureties.[3] Still, a comparison of bid bonds with performance and payment bonds reveals no difference sufficient to explain why a governmental duty to mitigate should exist in one and not the other. Even so, this issue need not finally be decided here because even assuming that a duty to mitigate exists, the Court finds, as explained hereafter, that the Government acted reasonably and responsibly in the administration of the Vitoangelo contract and did not fail to meet any putative duty to mitigate.

The Court also need not reach whether Peerless may assert defenses independent of those that Vitoangelo could raise. Again, even assuming that Peerless can assert such defenses, they fail; the United States did not abuse its discretion or fail in any duty arguably owed Peerless, thus Peerless is liable on the bid bond.

### C. *The United States' Counterclaim*

The United States asserts that Peerless is liable for $419,000, the amount allegedly due under the bid bond, because Vitoangelo breached the contract by failing to obtain the requisite Miller bonds. Under federal contract law, a contract exists from the time the United States accepts the bid of the offeror. It makes no difference that the offeror did not obtain the required bonds. *See Aetna Casualty & Surety Co. v. United States*, 208 Ct.Cl. 515, 526 F.2d 1127, 1130 (1975), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976). The contractor breaches an enforceable contract when it fails to obtain the appro-

---

**3.** This is entirely understandable given the paucity of authority regarding bid bond claims. Llowell Welnack, in-house counsel for Peerless, testified on cross-examination that in his sixteen years of experience with Peerless, there was only one other occasion in which a claim was made on a bid bond.

priate bonds. *Id.* Vitoangelo, therefore, was clearly in default when it failed to obtain the requisite payment and performance bonds. *See also The Hellenic Corp.*, 86–2 BCA P18,974 (1986) (failure to obtain performance and payment bonds does not prevent the formation of a binding contract; a contract comes into existence upon issuance of the award notice).

As surety, pursuant to the terms of the bid bond, Peerless is liable on the bond for up to 20 percent of the contract amount.[4] Since the contract amount was $2,095,000, Peerless' maximum liability is $419,000. The United States asserts that because its reprocurement costs were $829,577, Peerless is liable for the entire bid bond default amount of $419,000.

■ Peerless raises several defenses. First, Peerless claims that Vitoangelo exceeded the scope of its agreement with Peerless in bidding over $700,000 on a project.[5] Presumably, it is Peerless' contention that since Vitoangelo exceeded the scope of its agreement, Peerless is not liable to the United States. Yet, misrepresentations or fraud by a principal to a surety are not chargeable to the obligee absent proof that the obligee had notice of the misrepresentation or fraud. *Chrysler Corp. v. Hanover Insurance Co.*, 350 F.2d 652 (7th Cir.1965), *cert. denied*, 383 U.S. 906, 86 S.Ct. 890, 15 L.Ed.2d 664 (1966). Here, there is no proof or allegation that the United States had knowledge of any alleged fraud upon Peerless by Vitoangelo. Moreover, there is evidence that Peerless knew of and approved the bid bond amount; the bid bond is signed by Gus Zervos, the local agent of Peerless. Lena Semola, the government contracting officer, testified that she spoke with Zervos in his capacity as agent for Peerless on Sep-

tember 13, 1985, the day of the contract award. Clearly, Peerless had knowledge of the contract amount through its agent, Zervos. Even if Zervos exceeded the scope of his agency or Vitoangelo exceeded the scope of its authority, Peerless cannot escape liability absent knowledge by the United States. This defense, therefore, fails.

■ Second, Peerless claims that it is not liable because the United States failed to act on ARTCO's bid protest. Peerless asserts that ARTCO's protest was a *size* protest of Vitoangelo, therefore the contracting officer acted "improperly" in failing to forward the size protest to the SBA for a determination, as required by government regulations. *See* 48 C.F.R. § 22.608–3(b)(2) (1986). Yet the Court finds that ARTCO's protest with respect to Vitoangelo was not a size protest, but rather a "responsiveness/responsibility" protest. ARTCO's letter states that Vitoangelo is not a responsible or responsive bidder. In separate paragraphs, ARTCO specifically alleges that Dependable and Champagne–Weber, Inc., the fourth low bidder, are big businesses and do not meet the small business set-aside criteria. Under these facts, the Court finds that the ARTCO protest of Vitoangelo was not a size protest.

In addition, Lena Semola, the government contract officer who received the bid protest, testified that there was nothing in ARTCO's protest of Vitoangelo that led her to believe that it was a *size* protest. She treated the protest solely as a responsiveness/responsibility protest, and testified that there was nothing in Dunn & Bradstreet or other reports to indicate that Vitoangelo was not within the small business

4. As stated in the Court's findings of fact, *supra*, the purpose of a bid bond is "to protect the United States in case the bid is withdrawn or the contractor fails to execute the contractual documents or fails to give a performance bond." *United States v. Maryland Casualty Co.*, 213 F.Supp. 800, 803–04 (E.D.N.Y.1963). Clearly, the Peerless bid bond was intended to protect the Government in case Vitoangelo failed to obtain Miller bonds, and that is exactly what occurred here.

5. Peerless claims that it had an agreement with Vitoangelo whereby Vitoangelo agreed not to use Peerless as surety when bidding on contracts over $700,000. Yet, Peerless issued blank bid bonds to Vitoangelo, thus Vitoangelo was able to bid on the Navy contract without prior approval from Peerless. Peerless therefore assumed the risk that Vitoangelo would use these blank bid bonds in bidding on contracts for amounts exceeding $700,000.

size requirements;[6] in any event, there was no evidence that Vitoangelo would not have met the small business requirement had ARTCO's protest been forwarded to the SBA. In making a responsibility determination, a contracting officer enjoys wide discretion. *See General Research Corp. v. United States,* 541 F.Supp. 442, 446 (E.D. Va.1982) (citing *Venice Maid Co. v. United States,* 225 Ct.Cl. 418, 639 F.2d 690, 698 (1980). Under these facts, the contracting officer did not abuse her discretion in failing to forward ARTCO's protest to the SBA.

Third, Peerless asserts that the United States breached its duty to mitigate damages after the contract award by (i) failing to terminate the Vitoangelo contract at an earlier date, and (ii) delaying reprocurement. In determining whether the United States breached its duty in failing to terminate Vitoangelo at an earlier date, the appropriate standard of care must be established. Although no reported cases set forth the standard of care owed by the government to a bid bond surety, there exists no reason for not applying the same standard found in the Miller bond surety cases.[7] The standard there is whether the government acted arbitrarily or capriciously in exercising its discretion not to terminate a contractor. As noted in *Balboa:*

> Where the Government is entitled to exercise its discretion, the "plaintiff has an unusually heavy burden of proof in showing that the determination made ... was arbitrary and capricious." *Royal*

*Indemnity Co. v. United States,* 208 Ct.Cl. 809, 529 F.2d 1312, 1320 (1976); and "[t]he standard of proof to be applied in a case where an arbitrary and capricious disregard of the surety's interests, and an abuse of discretion, are charged, must be, and is, high." *Id.,* (citing *Keco Industries, Inc., v. United States,* 192 Ct.Cl. 773, 428 F.2d 1233 (1970)); *United States Fidelity & Guaranty Co. v. United States,* 676 F.2d at 628.

*Balboa,* 775 F.2d at 1164; *see also Ohio Casualty,* 12 Cl.Ct. at 594.

■ Here, there is no evidence that the United States abused its discretion in failing to terminate the Vitoangelo contract at an earlier date. On October 1, 1985, after Vitoangelo failed to provide the requisite bonds, the Government issued a "cure notice" requesting the bonds be provided within ten days. Peerless received a copy of this notice. The Navy then received a letter from Vitoangelo that the bonds would be provided by October 15. Margaret Gettings, head of the construction contracting branch of the Navy, testified that Vitoangelo asked for an extension of time to provide the bonds and was granted the extension because performance of the contract was not going to begin until April of 1986. When the bonds were not forthcoming, the Navy promptly sent a "show cause" letter to Peerless on November 6. On November 15, Vitoangelo responded that it had obtained the bonds from another surety, but these bonds were unacceptable

---

**6.** Miss Semola, on direct examination by counsel for Peerless, testified that ARTCO's protest focused on Vitoangelo being a responsible/responsive bidder, and that ARTCO "made an issue as to [Vitoangelo's] failure to indicate on [its] representations and certification form that he was controlled by a parent company." Semola further testified that she had contact with Mr. Vitoangelo and he provided her with information that he was in no way controlled or operated by any other company, thus she determined that Vitoangelo was a responsive/responsible bidder. In addition, Margaret Gettings, head of the construction contracting branch of the Navy, testified that in determining the responsibility of any contractor, the Government takes certain actions. "[W]e ask the contractor first of all to confirm his bid, ... to ensure he hasn't made any mistakes. ... We ask for a

financial statement, for references, for a bank reference. We review his bid with an eye to the other bidders and the government estimate. In this particular case, we went one step further: we called the contractor. We went over the scope of the work. ... We call the bank. We call Dunn and Bradstreet." Both witnesses were uncontradicted. Their testimony confirms that the Government acted responsibly in determining whether Vitoangelo was an appropriate contractor.

**7.** Peerless urges the Court to adopt the rationale of *Balboa* and *Ohio Casualty* and impose a duty on the Government to mitigate a surety's damages. It follows that Peerless cannot complain that this Court adopts the standard of care set forth in those cases.

because the surety did not hold a certificate of authority for federal bonds. The Vitoangelo contract thus was terminated on December 4, 1986. In all respects, the Navy acted promptly, reasonably, and with due respect for the rights and obligations of all bidders. Accordingly, the Court holds that the Government did not abuse its discretion in waiting to terminate Vitoangelo until December 4, 1985.

■ Finally, Peerless contends that the contracting officer failed to reprocure the contract in a timely fashion. Here again, the facts do not support Peerless' contentions. After terminating the Vitoangelo contract, the government contacted the second-highest bidder of the original IFB, Dependable. Dependable offered a price of $176,000 higher than their original offer, therefore, Margaret Gettings, the head of the construction contracting branch for the Army, decided to reprocure the contract because she felt that the government could receive a better bid. Her testimony on this point is uncontradicted and dispositive.

Q: Now, when you decide, when Dependable came back to you with the increased bid price, what did you decide to do with their increased bid price?

A: Basically, at that point, we were in the January time frame. Probably, one of the best times to solicit bids on construction contracts, in my experience, is in the January through March time frame, because it's at the beginning of the construction season. It's the time when contractors are out there looking for jobs for the next summer. This is obviously a spring/summer-type job. It's not indoors; it's outdoors. It is totally dependent on the weather. And so we felt that we, there was a possibility that we could get competitive bids at a better price if we recompeted the job.

Basically, at this point, we were dealing with Dependable on a sole source basis. He could pretty much, he could, could have come back to us and say, "I want to raise my price ten thosand," or, "I want to raise it 500,000." We were at his mercy and so, consequently, we thought that there was a possibility that we would get a better price in a competitive atmosphere.

The contract was reprocured on March 4, 1986. Although Dependable was the low bidder, it was found to be a large business therefore ARTCO, the second low bidder, was awarded the contract in the amount of $2,934,577.

The Court holds that, in deciding to reprocure, the contracting officer did not abuse her discretion. Again, in reprocuring a defaulted contract, the contracting officer has very broad discretionary powers. *Astro Space Laboratories v. United States*, 200 Ct.Cl. 282, 470 F.2d 1003, 1017 (1972). Given the facts of the case, especially the fact that the contract was for outdoor repairs of a facility located in Detroit, Michigan and thus could not begin until spring 1986, the contracting officer did not abuse her discretion.

■ In order to recover its excess procurement costs, the United States must show: (1) that it reprocured a contract similar to the terminated contract; (2) that it incurred excess costs in a sum certain; and (3) that it acted reasonably to minimize excess costs and damage resulting from the default. *The Hellenic Corp.*, 86–2 BCA P18,974 (1986). As discussed above, the Government has met all three criteria and is therefore entitled to the bid bond penal sum.[8]

Clearly, the United States did not act arbitrarily and capriciously in its handling of the Vitoangelo contract. Peerless' rem-

---

**8.** Where there has been a default and subsequent reprocurement, "the Board [of Contract Appeals] has measured the actions of the Government by the standard which the courts have adopted as a test of reasonableness for repurchases under defaulted contracts, i.e., the actions which would have been taken by a prudent man under the same circumstances." *Space Avionics, Inc.*, 71–1 BCA P8784 at 40,801, *cited in The Hellenic Corp.*, 86–2 BCA P18,974 at 95,838 (1976). Here, the contracting officer's

edy, if any, may be against Vitoangelo,[9] but the United States cannot be held liable for Vitoangelo's alleged improprieties. Finally, even if the United States acted according to Peerless' every desire, Peerless would still be liable for the full amount of the penal bond. If in October 1985 the United States had terminated the Vitoangelo contract, it could not have awarded the contract to Dependable because of Dependable's size. ARTCO, therefore, would have been awarded the original contract. Yet ARTCO's first bid was in the amount of $2,783,000, which was $688,000 higher than Vitoangelo's. Therefore, under the scenario that Peerless suggests, the United States would still be entitled to the full $419,000 penal bond sum. In any event, therefore, Peerless remains liable. Accordingly, judgment is granted to the United States on its counterclaim in the amount of $419,000.

### D. *Prejudgment Interest*

The final issue before the Court is whether to award the United States prejudgment interest. Although there are no statutes or cases directly in point, analogous authorities indicate that the award of such interest is discretionary. *See General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211 (1983) (decision to award prejudgment interest in patent infringement action will be set aside only if it constitutes an abuse of discretion). Here, for reasons of its own, the Government delayed in bringing suit against Peerless; indeed, Peerless was moved to bring this declaratory judgment action because the Government was ambiguous as to whether it would file suit. Also, given the paucity of authority concerning the rights of bid bond sureties, Peerless' action was brought in good faith. Accordingly, The United States' request for prejudgment interest is denied.

actions were in accordance with this requirement.

9. In a hearing prior to trial, counsel for Peerless stated that remedies against Vitoangelo were being pursued.