UNITED PACIFIC INSURANCE
COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 321–86C.

United States Claims Court.

Feb. 2, 1989.

Paul R. Howell, Salt Lake City, Utah, for plaintiff.

Katherine A. Day, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

### ORDER

MOODY R. TIDWELL, III, Judge:

This action comes before the court on parties' cross motions for summary judgment. In dispute is whether defendant abused its discretion in issuing a progress payment during the course of a construction contract.

### FACTS

On March 10, 1983, defendant through the Department of the Air Force awarded a contract to Electro Technical Corporation (ETC) for the construction of an emergency power system at Hill Air Force Base, Utah. Plaintiff, United Pacific Insurance Company, provided payment and performance bonds pursuant to the Miller Act, 40 U.S.C.

§§ 270a–270d (1982). Several months after work had begun on the project, ETC prepared an application for a fifth progress payment in the amount of $450,000.00 for diesel engine generator sets and $36,000.00 for electronic switchgear, stating therein that the equipment was ninety percent complete. The amount sought was more than half the original contract price and constituted a major portion of the contract.

Before approving the payment, project engineer Brian Nosker and project inspector Key Pittman met with representatives of ETC to visually confirm the progress of the generator sets, as represented by ETC, since progress payments were normally issued only for work already completed. The subcontractor in charge of manufacturing the generator sets, which consisted of generators, auxiliaries and gauges mounted onto diesel engines, had only the diesel engines in its possession. Individuals at that subcontractor's yard assured Nosker and Pittman that the rest of the components were either on order or in transit and that all were intended for the Hill Air Force Base project. No apparent proof of those assertions were provided. Nosker and Pittman did not inspect nor inquire about the switchgear which was to be furnished by a different subcontractor. In truth, the components of the switchgear had not been ordered, let alone assembled, and contrary to the statements of ETC, neither the generator sets nor the switchgear were ninety percent complete. In addition, plaintiff was required by the terms of the contract to present shop plans and submittals for the generator sets and electronic switchgear to defendant for its approval. ETC's submittals, however, had not passed government scrutiny and, at the point in time when ETC claimed that the equipment was ninety percent complete, were in a state of disapproval. Despite ETC's apparent false statements about the degree of completion of the equipment, and the disapproval of its submittals, the contracting officer approved ETC's application and caused a check to be issued in the full amount requested for the fifth progress payment on September 1, 1983. The check was deposited into ETC's general account, but the funds were not used by ETC to pay for the generator sets or the electronic switchgear.

In late December, 1983, an unidentified disgruntled subcontractor informed defendant that ETC was not paying its bills and was in shaky financial condition. Defendant apparently chose not to investigate that allegation and continued to make progress payments during the course of construction.[1] Progress was made on the contract and the completed generator sets were delivered to the jobsite on March 8, 1984, and the switchgear on August 28, 1984, almost a year after it was paid for. In October 1984, when it became obvious that the contractor's fiscal problems might indeed threaten final completion of the project, defendant ceased making progress payments to ETC. The court notes that prior to that time defendant had received no notification from plaintiff that ETC was in financial difficulty or that it should stop making progress payments. On March 6, 1985, a year and a half after defendant became aware of the problem, plaintiff informed defendant of ETC's poor financial state and requested that all future progress payments, plus retainage, be forwarded to plaintiff. Apparently, defendant complied with this request. The project was completed almost a month later on April 2, 1985, a full year after the scheduled completion date. The subcontractors working on the generator sets and switchgear were paid, not by ETC, but by plaintiff in accord with the surety agreement.

## DISCUSSION

Summary judgment is appropriate when there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). In evaluating a motion for summary judgment, any doubt over whether there is a genuine issue of material fact must be

---

1. While several progress payments were made to ETC throughout the course of the contract, the subject of this action is limited to the fifth progress payment. There was no alleged impropriety about the other payments.

resolved in favor of the non-moving party. *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972); *Campbell v. United States,* 2 Cl.Ct. 247, 249 (1983). In addition, the inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). The court agrees with the parties that there are no genuine issues of material fact in dispute and that this case is properly before the court for disposition on cross motions for summary judgment.

Plaintiff brought suit pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (1982), alleging that defendant had no discretion to authorize the progress payment No. 5 because such payment went beyond the specific terms of the payments clause of the contract. In the alternative, plaintiff argued that even if defendant had the discretionary authority to issue the fifth progress payment, that discretion was abused when defendant acted in complete disregard of plaintiff's interests in the face of strict contractual guidelines to the contrary. Defendant countered simply that the contracting officer had the discretion to make the progress payment, that he acted within his authority, and that plaintiff failed to meet its burden of proof in demonstrating an abuse of discretion.

In its foundational argument, plaintiff maintained that the contract was the sole source of the contracting officer's discretionary power, setting forth terms and conditions which had to be met before payment for off-site materials could be made. The specific contract language relied on by plaintiff states:

PAYMENTS TO CONTRACTOR (1979 MAR) ... Material delivered to the Contractor at locations other than the site may also be taken into consideration (1) if such consideration is specifically authorized by the contract and (2) if the Contractor furnishes satisfactory evidence that he has acquired title to such material and that it will be utilized on the work covered by this contract.

Plaintiff argued that because ETC did not have, indeed could not have had, title to the diesel engine generator sets and electronic switchgear, defendant failed to comply with the conditions for payment of off-site material and thus had no authority to make the fifth progress payment. Plaintiff relied upon *Argonaut Ins. Co. v. United States,* 193 Ct.Cl. 483, 434 F.2d 1362 (1970), in which that court noted that the contract "gave defendant the right to exercise broad discretion in administering payments as the work progressed in order to promote performance." *Id.* at 494, 434 F.2d at 1368. While plaintiff may be somewhat correct in its view that discretionary power is associated with contractual terms, it is mistaken in its argument that the source of that authority is found solely within the four corners of the contract. As stated in *Argonaut:*

[W]e call attention to the well-established principle that the subrogation right claimed by plaintiff is not a right that springs from contract but is merely a creature of equity, to be carried out in the exercise of equitable discretion and with due regard to the legal and equitable rights of others.

\* \* \* \* \* \*

During performance, the Government's role is substantially different from that of a mere stakeholder of a final contract payment. The defendant has an important interest in the timely and efficient completion of the contract work. In furtherance of this interest, the Government contracts for a broad range of rights which are designed to promote continuation of the contract work. These provisions give the Government considerable discretion and flexibility in administering the contract. Public policy supports this flexibility....

*Id.* at 493, 494, 434 F.2d at 1367, 1368 (citations and footnote omitted). To overcome the various unforeseen circumstances which may hinder performance, contracting officers must be permitted broad discretion and flexibility. *Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1164 (Fed.Cir.1985). Thus, plaintiff's argument that the con-

tracting officer had no discretionary authority to make the fifth progress payment because defendant failed to comply with the terms of the contract is not enough to prove its case.

■ Defendant's authority to make progress payments is limited by its "duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract." *Id.; Argonaut*, 193 Ct.Cl. at 495, 434 F.2d at 1368. The contracting officer is often faced with the complex dilemma of balancing the government's interests in fully performing the contract in a timely manner against conduct that might harm the surety. *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 14, 475 F.2d 1377, 1385 (1973). While the actions of the contracting officer are normally given great deference, when the interests of the surety are arbitrarily or capriciously ignored an abuse of discretion exists. *Royal Indem. Co. v. United States*, 208 Ct.Cl. 809, 823, 529 F.2d 1312, 1320 (1976). But plaintiff has the heavy burden of showing that defendant acted with such disregard. *Id.* Though this standard may be difficult to meet, it is not an impossible burden to carry, especially in such extreme cases as this. *See Ohio Casualty Ins. Co. v. United States*, 12 Cl.Ct. 590, 591 (1987).

■ The factors to be considered in determining whether plaintiff has met its burden of proof have been delineated by the United States Court of Appeals for the Federal Circuit in a similar case, *Balboa Ins. Co. v. United States*, 775 F.2d 1158 (Fed.Cir.1985). For the purpose of analysis, the court will review the facts of this case in light of each factor and then weigh the outcome in the balance of plaintiff's interests versus the interests of the sovereign. No one factor, however, is to be dispositive. *See id.* at 1165. The so-called *Balboa* factors, 775 F.2d at 1164, are as follows:

1. Attempts by the government after notification by the surety to determine whether the contractor had the capacity and intent to complete the job.

This factor has minimal merit in the court's analysis since it generally applies to cases of contractor default. In this case the progress payment in question was made long before surety notification. The factor may, however, be relevant in evaluating whether defendant made sufficient attempts to determine if ETC had the intent or capacity to complete the contract in light of the lack of veracity in the statements made in its application for the fifth progress payment. Even a casual perusal of the facts revealed that defendant at the very least was amiss in its determination that ETC had actually brought the generator sets and switchgear to a ninety percent complete state. Defendant inspected the generator sets and found that material components were not in the possession of either the contractor or subcontractor. Defendant did not bother to check the status of the switchgear. By not going beyond an initial inspection of the generator sets or making any inquiry about the switchgear, defendant utterly failed not only to protect the interests of the surety, but also its own. In the circumstances, defendant had actual knowledge that the equipment in question was far from ninety percent complete. Yet the fifth progress payment was made without apparent question. Defendant's callous failure to inquire into the status of the switchgear and its disregard of the observed status of the generator sets topples the equitable scales of justice in plaintiff's favor.

2. Percentage of contract performance completed at the time of notification by the surety, and efforts by defendant to determine the progress made on the contract after notice by surety.

This factor focuses the court's attention on facts relating to the contracting officer's duty to complete the contract in a timely manner. As a project progresses, more deference must be afforded defendant's decisions since its stake in the contractual outcome increases as the completion date nears. In this case, by the time plaintiff notified defendant of ETC's default, both the generator sets and the switchgear had been delivered to the jobsite

and the project was nearly finished. For purposes of proper equitable analysis the court must evaluate this factor at the time of the fifth progress payment since surety notification was a point distant from the relevant time frame. ETC asserted in its application for payment that the generator sets and switchgear, a material portion of the contract, were ninety percent complete. In reality the only components of the generator sets on hand were the diesel engines, stored at a subcontractor's yard. The other parts of the generator sets (generators, auxiliaries, and gauges) were in transit, on order, or not yet in existence. The switchgear was not even a twinkle in its creator's eye and would not be delivered to the job site until August 1984, one year after defendant paid for it. Because these items constituted a major part and expense of the contract, defendant should have been especially sensitive to the propriety of any payments made to ETC and the potential ramifications to the surety and the treasury if payments were made for nonexistent equipment. There is no question that defendant was under an obligation to ensure that the material paid for by the fifth progress payment actually existed, that defendant held title to the equipment, and that it was going to be used to complete the Hill Air Force Base project. Defendant failed to do so and must be held accountable for its omission.

3. Whether the contract was subsequently completed by the contractor.

While this factor is not in itself conclusive, it may be relevant to show the reasonableness of defendant's conduct. ETC did eventually complete the contract, but one year late and only after plaintiff had paid subcontractor billings under the surety agreement. It is questionable whether the project could have been completed by the contractor without assistance from the surety. The necessity of plaintiff's intervention in light of this factor weighs in plaintiff's favor.

4. Whether payments to the contractor subsequently reached the subcontractors and materialmen.

This factor goes to the equitable obligation of defendant to subcontractors to see that they are compensated for work performed under the contract. Because plaintiff would be liable to the subcontractors in the event of contractor default, any money that reached the subcontractors would further the interests of the surety. The objectives of defendant would also be furthered in the timely completion of the contract. *Balboa,* 775 F.2d at 1165. There is no question that the fifth progress payment funds did not reach the deserving parties.

5. Whether the contracting agency had notice of problems with the contractor's performance prior to the surety's notification of default to the government.

The facts indicate that defendant unquestionably knew of ETC's financial difficulties and show progress under the contract before receiving plaintiff's default notification. Similarly, defendant must have known that the equipment at issue was not ninety percent complete, as misstated in ETC's fifth progress payment application. The court cannot imagine that defendant's site inspection did not alert the contracting officer that something was amiss; defendant could not have been put on clearer notice that there were problems with ETC's performance. Defendant's unbelievable disregard of prominent warning signals lends great credence to plaintiff's arguments.

6. Whether the government's action violates one of its own statutes or regulations.

It is clear that defendant did not adhere to the contractual provision governing the issuance of progress payments for material stored at a location other than the project site. The bounds within which the contracting officer could exercise its discretion were set as follows:

SP–15 PAYMENT FOR OFF–SITE MATERIAL: With reference to the General Provision entitled Payments to Contractor, material delivered to the Contractor at locations other than the site may be taken into consideration in the preparation of estimates at the discretion of the Contracting Officer, provided the

Contractor furnishes satisfactory evidence that he has acquired title to such material and that it will be utilized on the work covered by this contract.

The facts illustrate that ETC could not have held title to the diesel generator sets or electronic switchgear at the time of the fifth progress payment. The only components to the generator sets in existence at that time were the diesel engines. The electronic switchgear, as noted previously, was not even in being. Defendant argued that the contract specifications provided that title to the equipment in question vested in it upon ETC's receipt of the progress payment. The court must wonder where such title originated. How could ETC hold title to equipment not yet delivered, built, or for that matter, even ordered? It is clear that defendant grossly violated its own contract when it issued the fifth progress payment, an action that indicated a total disregard of the equitable duty owed to the surety. This factor greatly favors plaintiff's position.

7. Evidence that the contract could or could not be completed as quickly or cheaply by a successor contractor.

This factor's relevance is limited by its applicability to cases dealing with a defaulting contractor. Because this action involves the propriety of a progress payment, the factor has little significance. In any event, there was no evidence in the record that the contract would have been completed more effectively by a second contractor.

■ When the weight of the *Balboa* factors decidedly tip the equities towards plaintiff, an abuse of discretion usually exists. *See Ohio Casualty Ins. Co. v. United States*, 12 Cl.Ct. 590, 594 (1987). While these factors are not in themselves conclusive, they do help clarify whether defendant fulfilled its duty to protect the interests of plaintiff. It is apparent to this court, viewing the facts in light of *Balboa*, that defendant failed to protect not only the interests of the surety, but its own, and therefore abused its discretion in issuing the fifth progress payment. Equity, common sense, and the law support this conclusion. It is generally accepted that progress payments are issued only for work which has already been completed. As this case was presented to the court, the contractor falsely claimed in its application for the fifth progress payment that the switchgear and generator sets were ninety percent complete. In truth, none of the final items were anywhere near any degree of completion at the time of the payment and defendant knew it. The switchgear had not even been ordered, let alone manufactured. The generator sets had not been delivered or assembled. Only the diesel engines, a single component of one item contracted for, were extant. Additionally, the submittals for the generators sets and switchgear were not yet approved and, in fact, had been disapproved by defendant several times. Defendant knowingly used taxpayer money to pay for items that did not exist, and even if they had been built at that time would have been unacceptable. Such conduct goes far beyond any discretion allowed a contracting officer in approving progress payments. The court does not make a determination in this grave matter, even though it believes that such a serious allegation warrants further investigation outside the parameters of this lawsuit.[2]

## CONCLUSION

Plaintiff has presented sufficient proof to show that defendant abused its discretion in issuing the fifth progress payment and therefore ignored its obligation to protect the surety's interests, as well as its own. Thus plaintiff is entitled to judgment as a matter of law. Accordingly, plaintiff's motion for summary judgment is granted and defendant's motion for summary judgment is denied and judgment is entered for plaintiff in the amount of $486,000. Plaintiff also requested all monies retained by

2. No allegations of fraudulent conduct by ETC or defendant surrounding the fifth progress payment are before the court and the court will not address them *sua sponte*. Indeed, it may well be that some of the actions by defendant and ETC are proper for investigation by the Inspector General or other elements of the Department of Justice.

the United States under the ETC contract. Defendant did not dispute this claim, hence, it is ordered that those funds shall be paid to plaintiff. Plaintiff has requested interest on the damages but has failed to prove entitlement. Plaintiff also requested attorneys' fees and costs. The court will consider the award of attorneys' fees and costs pursuant to 28 U.S.C. § 2412 (1982) upon presentation of a properly filed petition. The Clerk is directed to take appropriate action. Costs to plaintiff.

IT IS SO ORDERED.