**BALBOA INSURANCE
COMPANY, Appellant,**

**v.**

**The UNITED STATES, Appellee.**

**Appeal No. 85–823.**

United States Court of Appeals,
Federal Circuit.

Oct. 28, 1985.

---

Jeff B. Slagle, Atlanta, Ga., argued for appellant. With him on brief was Dewitte Thompson.

Sara V. Greenberg, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With her on brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Sandra P. Spooner, Washington, D.C.; Susan D. Warshaw, Trial Atty., Dept. of Navy, Washington, D.C., of counsel.

Before RICH and KASHIWA, Circuit Judges, and JACK R. MILLER,* Senior Circuit Judge.

JACK R. MILLER, Senior Circuit Judge.

This is an appeal by a Miller Act surety from a partial summary judgment by the Claims Court (No. 6–82C (Oct. 4, 1984)) denying the surety's claim for the recovery of a progress payment of $23,163.50, alleged by the surety to have been improperly paid the prime contractor by the Government after it had notified the Government that the contractor was in default. We vacate and remand for further proceedings.

## BACKGROUND

Balboa Insurance Company ("Balboa") was the surety for the contractor, Chemical Engineers & Constructors, Inc. ("CEC"), on contract N62467–79–C–2604 ("contract") entered into August 8, 1979, for alterations to an existing structure at the Naval Training Center, Orlando, Florida. Balboa provided CEC Miller Act (40 U.S.C. §§ 270a–

---

* Judge Miller assumed senior status June 6, 1985.

270d (1982)) payment and performance bonds.

The fifth payment, at issue here, was requested from the Government by CEC on January 30, 1980. According to Navy interoffice memoranda, the amount of completed performance under the contract at that time was 91%. Payment was authorized on February 1, 1980. Balboa received written notice by early February that led it to believe that CEC was in financial straits and would not be able to fulfill its payment and performance obligations. On February 14, 1980, it addressed a letter to this effect to the Contracting Officer (received the next day) demanding that no further contract funds be released without its consent. A Government check in the amount of $23,163.50 was issued and disbursed to CEC on February 21, 1980, nevertheless.

Subsequently, CEC authorized the Government to make future contract payments directly to Balboa. (The sixth progress payment check, also issued to CEC, was disputed in the Claims Court, but is not at issue in this appeal.) In June, 1980, the Government terminated the contract, and another firm completed the contract. Balboa asserted that it should have received the fifth payment check and, when the Government denied liability, sought recovery of that amount in the U.S. Claims Court.[1]

The opinion of the Claims Court was issued from the bench. The court granted the Government's motion for summary judgment and denied the Government's liability to the surety. It is from this judgment that Balboa appeals.

## OPINION

### A. Jurisdiction

The Government argues that because it owes no duty to protect the surety from its principal, CEC, during performance, payment to the contractor is "not an appropri-

ate subject for judicial review to determine whether the Government considered the surety's interests." Further, it contends that a surety is similar to a subcontractor, who is not in privity of contract with the Government. Thus, it concludes that neither the Claims Court nor this court possesses jurisdiction over the suit of a surety against the United States to recover an allegedly improperly paid progress payment.

Decisions of our predecessor court and the Supreme Court make clear that a surety is *not* in the same position as that of a subcontractor or materialman. *E.g., United Electric Corp. v. United States,* 647 F.2d 1082, 1086 (Ct.Cl.), *cert. denied,* 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981). A suretyship is the result of a three-party agreement, whereby one party (the surety) becomes liable for the principal's or obligor's debt or duty to the third party obligee, *see United States v. United States Fidelity & Guaranty Co.,* 236 U.S. 512, 35 S.Ct. 298, 59 L.Ed. 696 (1915). Both the obligor-principal (the prime contractor) and the surety are liable to the obligee (here, the Government), and no suretyship *exists* in the absence of any of the three parties. In contrast to a subcontractor, which has no obligations running directly to or from the Government, *United States v. Munsey Trust Co. of Washington, D.C.,* 332 U.S. 234, 241, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947) (and therefore possesses no enforceable rights against the United States), a surety, as bondholder, is as much a party to the Government contract as the contractor. If the *surety* fails to perform, the Government can sue it on the bonds. *E.g., Carchia v. United States,* 485 F.2d 622 (Ct.Cl. 1973).

Although it is conceivable that under certain circumstances a surety could assert rights against the Government under the

---

**1.** In its complaint, Balboa asserted that it "was called upon to make payment to subcontractors and material suppliers of Chemical on the project, and made such payments in the amount of $66,411.68." This figure was not disputed in the Claims Court, and the determination of the issue was precluded by the summary disposition of the case. For jurisdictional purposes, we assume that Balboa has reimbursed CEC creditors under the contract.

third-party beneficiary rule, *see Montana Bank of Circle, N.A. v. United States*, 7 Cl.Ct. 601, 611 (1985), or even as one in privity in contract with the Government, *see Hanover Insurance Co. v. United States*, 279 F.Supp. 851, 852 (S.D.N.Y. 1967); *cf. Martin v. National Surety Co.*, 300 U.S. 588, 598, 57 S.Ct. 531, 535, 81 L.Ed. 822 (1937) ("The terms of the bond are read into the contract"), the traditional means of asserting a surety's claim is under the equitable doctrine of subrogation. Almost ninety years ago, the Supreme Court stated: "That [plaintiff], as surety on the original contract, was entitled to assert the equitable doctrine of subrogation is elementary." *Prairie State Bank v. United States*, 164 U.S. 227, 231, 17 S.Ct. 142, 144, 41 L.Ed. 412 (1896). Later, in *United States Fidelity & Guaranty Co. v. United States*, 475 F.2d 1377 (Ct.Cl.1973) (hereinafter *United States Fidelity*), the Court of Claims clarified the respective rights of subcontractors and Miller Act sureties to sue the United States by explaining:

> [T]he surety was entitled to the benefit of *all* the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid. The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the [United States].

475 F.2d at 1382.

The Government further contends that neither the Claims Court nor this court has jurisdiction over a claim by a surety for *non-retained* funds, as opposed to those not yet disbursed. It premises this argument on the assertion that

> [C]ases involving a surety's claim to retainages, ... in which the Government's role has been described as that of a "stakeholder," are readily distinguishable from this action, since those cases

involve rights arising through subrogation, upon satisfaction by the surety of outstanding subcontractor claims.... The concept of the United States as a stakeholder does not arise in a case such as this where the competing claims are those of the surety vis-a-vis the contractor. Rather, the theory is only applicable where the competing interests are those of the surety on the one hand and an assignee of the contractor on the other.

This assertion is untenable.

The Government's reasoning, that in this case the United States was not in the position of a "stakeholder" of the funds it had already disbursed to CEC, is based on its distinguishing cases in which the United States was found to be a "stakeholder" and the surety sought only the recovery of a retainage still in the possession of the Government. We are not persuaded that a difference exists for the purposes of jurisdiction. When a contractor defaults under the contract, the obligation of the surety then arises under its performance and payment bonds. When the surety then finances the contract to completion, it is subrogated to the contractor's property rights in the *contract balance*. *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); *Great American Insurance Co. v. United States*, 481 F.2d 1298, 1308 (Ct.Cl.1973) (hereinafter *Great Insurance Co.*). Upon subrogation, a surety's rights relate back to the date of the execution of the surety bond. *Fidelity and Deposit Co. v. United States*, 393 F.2d 834, 837 (Ct.Cl.1968). In *Great American Insurance Co. v. United States*, 492 F.2d 821 (Ct.Cl.1974) (hereinafter *Great American Insurance Co.*), (a case involving a suit to recover funds the surety alleged had been wrongfully disbursed), the Court of Claims, stated that

> [W]hen plaintiff [the surety] notified defendant of the unpaid claims of laborers and materialmen and asserted a claim to the unpaid contract balance, the defendant still held [as yet unpaid funds]. At that time, the Government asserted no claim to the [funds] so that the Government held that amount as a stakeholder

with full knowledge that the surety and the assignee claimed a right to the money.

492 F.2d at 825.

We agree with the conclusion of the Court of Claims that, upon notification by the surety of the unsatisfied claims of the materialmen, the Government became a stakeholder with respect to the amount not yet expended under the contract that it holds at the time of notification of default. However, we can discern no reasonable basis for the Government's distinction between retainages and progress payments when, as in this case, the surety informed the Government of the contractor's alleged breach before the payment was disbursed. *American Fidelity Fire Insurance Co.*, 513 F.2d at 1379–81. Whether and under what circumstances the Government chooses to disburse the progress payment in dispute pertains not to the issue of jurisdiction, but rather, to the propriety of the Government's actions.

The Government fails to show *any* support for its contention that the United States may not become a stakeholder when the surety's suit involves the contractor itself rather than a contractor's assignee; nor is there any meaningful distinction between them in the context of this case. An assignee of a defaulted contractor is also subrogated to the contractor's rights, *First National City Bank v. United States*, 548 F.2d 928, 935–36 (Ct.Cl.1977), and when a court determines the respective rights between the assignee and the surety, the only question is whose rights vested first.[2]

We disagree with the Government's argument that language in *Newark Insurance Co. v. United States*, 169 F.Supp. 955, 957 (Ct.Cl.1959), makes no sense unless read to differentiate between cases in which payments were made to a contractor and those in which the funds were disbursed to a contractor's assignee. In response to the Government's contention, 169 F.Supp. at 956, "that, since it has no money

in its hands which is owing to anyone ... there is no basis upon which it may be held liable," the court said:

Surely a stakeholder, caught in the middle between two competing claimants, cannot, in effect, decide the merits of their claims by the mere physical act of delivering the stake to one of them. If his position as stakeholder becomes uncomfortable, and the claimants do not take steps to get a judicial solution of the question, the law has provided him with an interpleader proceeding by which he can deposit the stake in court and walk out free of the annoyance of being in the middle.

If it is made to appear that the Government's officials, *after due notice* of the facts giving rise to an equitable right in the plaintiff surety company, and of the plaintiff's assertion of such a right, *paid out, without a valid reason* for so doing, the money in question to someone other than the plaintiff, *the plaintiff will be entitled to a judgment.*

169 F.Supp. at 957 (emphasis supplied). Accordingly, we are satisfied that the United States becomes a stakeholder with a duty of acting with reasoned discretion when a Miller Act surety alleges that the contractor has breached the contract by defaulting under one of the bonds.

In *National Surety Corp. v. United States*, 319 F.Supp. 45, 49 (N.D.Ala.1970) (*cited with approval in Great American Insurance Co.*, 492 F.2d at 825–26), the court addressed contentions by the Government, identical to those advanced in this case, to the effect that, in suits by a Miller Act surety, the surety's rights to contract funds upon default of its contractor-principal are limited to the percent retainage withheld by the Government, as opposed to the full amount of the progress payment. The district court there explained:

While it is true that many of the cases have dealt solely with retainage, it is apparent that this stems from the fact

---

**2.** The Court of Claims has upheld the superior rights of sureties' claims against the Government over those of, *inter alia*, assignees, a fi-

nancing institute, and a trustee in bankruptcy. *United Pacific Ins. Co. v. United States*, 319 F.2d 893, 895 (Ct.Cl.1963).

that the retainage is in many instances all that is left to battle over when the surety discovers that a default exists. It is clear from a review of the cases that the Courts make no distinction between earned progress payments and retained percentages in determining the surety's equitable rights upon the contractor's default.

The surety's rights apply to the *total fund*, no matter what it is called, which remains in the hands of the United States (or any owner-obligee) *at the time notice of default* under its bond is established.

(Emphasis supplied.) *Accord, American Fidelity Fire Insurance Co.*, 513 F.2d at 1379–81; *Great American Insurance Co.*, 492 F.2d at 825. *Cf. Home Indemnity Co. v. United States*, 376 F.2d 890, 895 (Ct.Cl. 1967) (United States held liable to the plaintiff surety despite fact that it had disbursed retainages and "the surety had [thus] lost the security which the law provides for it"). Thus, there is no valid distinction between money held by the Government which is a "retainage" and a "progress payment." In either case, the "total fund" remaining in the Government's possession, to the extent the surety has obligations arising under the contract, is available to the surety.

Finally, we disagree with the Government's assertion that the Court of Claims did not resolve the issue of whether it possesses jurisdiction in a situation similar to the one here. Several cases, although not decided on the merits in favor of a plaintiff surety, have recognized jurisdiction over a surety's cause. *E.g., United States Fidelity*, 475 F.2d at 1384; *Ameri-*

*can Fidelity Fire Insurance Co., supra;* *United Pacific Insurance Co. v. United States, supra; Newark Insurance Co. v. United States, supra.*[3]

In view of the foregoing, we hold that both the Claims Court and this court have jurisdiction to hear the claim of a Miller Act surety against the United States for funds allegedly improperly disbursed to a contractor.

### B. *Propriety of Summary Judgment*

The party moving for summary judgment bears the burden of establishing that the material facts are not in dispute and entitle it to judgment as a matter of law. 6 J. Moore, W. Taggart, and J. Wicker, Moore's Federal Practice ¶ 56.15[3] (2d ed. 1985). If an issue of credibility exists, or if the movant fails to establish that there is no genuine issue over any material issue of fact, the motion must be denied. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).[4] After the moving party has clearly established its case, the duty to go forward shifts to the party opposing the motion to produce evidence that places material facts in dispute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Lehner v. United States*, 1 Cl.Ct. 408, 413 (1983).

In response to Balboa's assertions in the Claims Court that the Government either did not exercise discretion, or, in the alternative, acted unreasonably in issuing the fifth progress payment to CEC, the Government moved for summary judgment, contending that its agents acted reasonably, and produced evidence describing some of the events leading to the February

---

**3.** It is apparent that with its jurisdiction arguments the Government is attempting to bootstrap its position by asserting that the "correct" result on the merits (in this case, denial of recovery to Balboa) precludes this court's jurisdiction. From there it is an easy step for the Government to claim that because this court lacks jurisdiction, it should not even address the merits of Balboa's claims. To adopt such circular reasoning would be tantamount to holding that *whenever* a surety could not recover on a claim against the Government, the court that so

held lacked jurisdiction to make such a determination. It is possible that the Government is confusing failure to state a cause of action with lack of jurisdiction, *see Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 259, 71 S.Ct. 692, 699, 95 L.Ed. 912 (1951), but if it does intend to assert that defense, we disagree with that contention as well.

**4.** Contrary to the assertion of the Government, this construction of Rule 56 has not been controverted by the Claims Court.

issuance of the progress payment to CEC. The Government's evidence establishes as an uncontested fact that, as of January 30, contract performance was on schedule. On the basis of this "undisputed" fact *alone,* the Claims Court determined that the Government's decision to pay CEC rather than Balboa was reasonable. Balboa argues that the court failed to consider a number of factors that the Court of Claims has determined to be important to resolution of the issue of reasonableness.

As the Court of Claims stated in *Argonaut Insurance Co. v. United States,* 434 F.2d 1362, 1367–68 (Ct.Cl.1970), there is a significant difference between the Government's role before and after completion of performance on a contract. As opposed to its interest in disbursing retainage payments after completion, during performance it has a vital interest in the "timely and efficient" completion of the work. It is to overcome "various unforeseen circumstances which may hinder performance" that the Government incorporates into the contract broad rights and permits the federal procurement officials broad discretion and flexibility. *Id.; United States Fidelity & Guaranty Co. v. United States,* 676 F.2d 622, 628 (Ct.Cl.1982). With respect to the surety, however, this discretion and flexibility is limited by its "duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract." *Argonaut Insurance Co.,* 434 F.2d at 1368.

Where the Government is entitled to exercise its discretion, the "plaintiff has an unusually heavy burden of proof in showing that the determination made ... was arbitrary and capricious," *Royal Indemnity Co. v. United States,* 529 F.2d 1312, 1320 (Ct.Cl.1976); and "[t]he standard of proof to be applied in a case where an arbitrary and capricious disregard of the surety's interests, and an abuse of discretion, are charged must be, and is, high." *Id.,* (citing *Keco Industries, Inc. v. United States,* 428 F.2d 1233 (Ct.Cl.1970)); *United States Fidelity & Guaranty Co. v. United States,* 676 F.2d at 628.

"It is common knowledge that contractors rely upon contract proceeds administered through progress payments to properly finance the contract." *Fireman's Fund Insurance Co. v. United States,* 362 F.Supp. 842, 846 (D.Kan.1973). Thus, the Government has no legal obligation to suspend a progress payment merely upon the unsupported request of a contractor's surety, *United States Fidelity & Guaranty Co. v. United States,* 676 F.2d at 628. However, when a surety has informed the Government that the contractor is in default, the Government has an obligation to take "reasonable steps to determine for itself that the contractor had the capacity and intention to complete the job." *Fireman's Fund Insurance Co.,* 362 F.Supp. at 848.

The following factors have been considered by the Court of Claims and other courts to be important in determining whether the Government has exercised reasonable discretion in distributing funds:

(1) Attempts by the Government after notification by the surety, to determine that the contractor had the capacity and intent to complete the job. *United States Fidelity & Guaranty Co. v. United States,* 676 F.2d at 631; *Royal Indemnity Co.,* 529 F.2d at 1321; *Argonaut Insurance Co.,* 434 F.2d at 1366, 1369; *Fireman's Fund Insurance Co.,* 362 F.Supp. at 848.

(2) Percentage of contract performance completed at the time of notification by the surety. *United States Fidelity & Guaranty Co. v. United States,* 676 F.2d at 631; *United States Fidelity,* 475 F.2d at 1385; *Argonaut Insurance Co.,* 434 F.2d at 1366.

(3) Efforts of the Government to determine the progress made on the contract after notice by the surety. *United States Fidelity & Guaranty Co. v. United States,* 676 F.2d at 631; *Royal Indemnity Co.,* 529 F.2d at 1320–21. *See United States Fidelity,* 475 F.2d at 1385.

(4) Whether the contract was subsequently completed by the contractor (not

conclusive, but relevant to show the reasonableness of the contracting officer's determination of the progress on the project). *See Argonaut Insurance Co.*, 434 F.2d at 1369.

(5) Whether the payments to the contractor subsequently reached the subcontractors and materialmen (this goes to the equitable obligation of the Government to subcontractors and others to see that they will be paid; also, because the surety is liable to the subcontractors, any money that reaches them furthers the objectives of the surety as well as those of the Government). *United States Fidelity*, 475 F.2d at 1385; *Argonaut Insurance Co.*, 434 F.2d at 1369.

(6) Whether the Government contracting agency had notice of problems with the contractor's performance previous to the surety's notification of default to the Government. *United States Fidelity*, 475 F.2d at 1385.

(7) Whether the Government's action violates one of its own statutes or regulations. *United States Fidelity & Guaranty Co. v. United States*, 676 F.2d at 630.

(8) Evidence that the contract could or could not be completed as quickly or cheaply by a successor contractor. *United States Fidelity & Guaranty Co. v. United States*, 676 F.2d at 631; *Royal Indemnity Co.*, 529 F.2d at 1321; *Argonaut Insurance Co.*, 434 F.2d at 1369.

■ In response to the Government's motion, Balboa presented extensive affidavit, deposition, and other evidence to the Claims Court, the underlying facts of which it would have attempted to prove at trial. Much of the evidence pertained to the factors listed above and included a portion of the Government's own Contract Administration Manual, Federal Regulations, and the contract language itself. Further analysis and evaluation are indicated inasmuch as the Claims Court granted the Government's motion solely on the basis that, as of January 30, over two weeks before Balboa notified the contracting officer of CEC's default, the contract was on

schedule and 91% complete. The Claims Court neither considered nor evaluated Balboa's evidence addressed to the above-enumerated factors.

■ Moreover, the Claims Court found that Balboa did not submit "any proof of the type of deliberate or fraudulent conduct required." Proof of "deliberate or fraudulent conduct" is only one way of demonstrating abuse of discretion and is *required* only when allegations of bad faith have been asserted. *See United States Fidelity & Guaranty Co. v. United States*, 676 F.2d at 629. Proof of such conduct is *not* required to prove arbitrary or capricious action or abuse of discretion on the part of the Government. *Cf. id.* at 629, 630 (different measures of proof or evidence required for bad faith and abuse of discretion). In its complaint, Balboa alleged only that the Government's issuance of the fifth progress payment evidences "a total *failure* by The United States *to exercise prudent discretion* in regard to the surety's interest on the contract bonded [*sic* ]" (emphasis supplied).

We are persuaded that the Government has not adequately shown the absence of dispute on all issues of material fact and, therefore, hold that summary judgment was improper.

The facts in this case have not been sufficiently analyzed to determine whether the Government's payment of the fifth progress payment was a reasonable exercise of the discretion conferred on the contracting agency by the terms of the contract and the applicable law and regulations. Accordingly, we vacate and remand for further proceedings consistent with this opinion.

VACATED AND REMANDED.