## RELIANCE INSURANCE COMPANY, Plaintiff,

v.

## The UNITED STATES, Defendant.

## No. 387–87C.

United States Court of Federal Claims.

March 22, 1993.

Christopher A. Kerosky, San Francisco, CA, attorney of record for plaintiff.

Bryant G. Snee, Commercial Litigation Branch, Civil Div., Dept. of Justice, Washington, DC, with whom were David M. Cohen, Director, and Stuart M. Gerson, Asst. Atty. Gen., attorneys of record for defendant.

## OPINION

HORN, Judge.

### BACKGROUND

This case is before the court on defendant's motion to dismiss claims three through twelve of plaintiff's complaint and for summary judgment on claims one and two of plaintiff's complaint, and on defendant's supplemental motion to dismiss claims one and two. Plaintiff invokes jurisdiction of this court pursuant to 28 U.S.C. § 1491 (1982), and 41 U.S.C. § 609 (1982). In its original dispositive motion, defendant contends that claims three through twelve of the complaint should be dismissed for lack of jurisdiction pursuant to 41 U.S.C. § 605(c)(1) (1982), and that the court should grant summary judgment for the defendant on claims one and two of the complaint. Defendant's supplemental motion, however, contends that claims one and two of plaintiff's complaint also should be dismissed for lack of jurisdiction.

Defendant alleges that although claims one and two of the complaint were certified, the balance of the claims were not. Defendant further asserts that what is framed in the complaint as ten separate claims (claims three through twelve) actually arose from a common set of operative facts and, therefore, should be considered as one claim. If these claims are addressed as "one claim," the total amount of the claim would exceed $50,000.00, in which case, defendant contends, the claim should have been certified, as required by the Contract Disputes Act. 41 U.S.C. § 601 et seq. (1982). Claims one and two were originally the subject of defendant's motion for summary judgment, however, after the decision in *Reliance Ins. Co. v. United States*, 23 Cl.Ct. 108 (1991), the defendant filed a supplemental motion to dismiss claims one and two alleging that the certification for those two claims was defective.

As is more fully discussed below, the defendant's motion to dismiss claims three through twelve of plaintiff's complaint is DENIED and defendant's motion to dismiss plaintiff's claims one and two is GRANTED.

## FACTS

On September 28, 1983, the United States Department of Agriculture (USDA), Food Safety and Inspection Service (FSIS) entered into prime contract # 50–5721–3–21 with the Small Business Association (SBA) for the installation of laboratory furniture and equipment at the FSIS Western Laboratory in Alameda, California, for an initial contract price of $1,023,400.00. On the same day, by contract # 98320496, the SBA subcontracted the work to H.T. Engineers and Contractors, Inc. (H.T. Engineers), to "fulfill and perform all of the requirements of contract No. 50–5721–3–21 for the consideration stated herein."

As required by the Miller Act, 40 U.S.C. § 270a et seq. (1982), H.T. Engineers secured the necessary bonds. Plaintiff, Reliance Insurance Company (Reliance) issued both a performance bond (in the amount of $1,023,400.00) and a payment bond (in the amount of $511,700.00) on September 28, 1983 as surety for contract # 98320496. The bonds were signed by Terrence T. Casey, attorney-in-fact for Reliance, and H.T. Liu, president of H.T. Engineers.

The notice to proceed with the project appears to have been sent to H.T. Engineers on July 16, 1984, and work on the project began on August 6, 1984. The original agreement between H.T. Engineers and the SBA called for completion of the project within 120 calendar days from the commencement of the work for a price of $1,023,400.00. After numerous problems at the work site, a meeting was held on February 14, 1985 to address the failure of H.T. Engineers to perform. Kenneth Huber (contracting officer), Kenneth Dunn (contracting officer's representative) and H.T. Liu (president of H.T. Engineers) were present at the meeting. At the meeting, a 10–day cure notice was delivered to H.T. Liu who was told that H.T. Engineers would be terminated for default if the conditions detailed were not cured within ten (10) days. On February 15, 1985, Huber and Dunn met with Terrence Casey, attorney-in-fact for Reliance, to inform him of the contract status. Huber wrote in his "trip report":

> [w]e met with Terry Casey of the bonding company & went over contract status. We gave him copies of invoices that are known to be outstanding. This equals almost $130,000. Terry said they are gearing up for take over, but cannot do anything until the termination is in effect. They would like to keep the same crews on for continuity. He said we should hold the $54,000.00 we have in Finance.

By letter dated February 20, 1985, Terrence Casey informed Pete Fjellstad at Reliance of the meetings taking place and the possibility of declaring H.T. Engineers in default. Casey wrote "The tone of the meeting [the February 25, 1985 meeting with Casey] was friendly. The government people struck me as reasonable and fair." The minutes in the record taken by Kenneth Huber reflect that on February 25, 1985 he talked to Mr. Stebbins of the bonding company and told him of the impending default. Stebbins told Huber to contact Gerald Knecht, Reliance's representative.

On February 25, 1985, USDA/FSIS terminated H.T. Engineers for default and called upon the surety to complete the project. At the time of default, the contract had undergone eleven change orders and H.T. Engineers had received seven progress payments totaling $810,815.13. One pending progress payment was withheld during the cure/default period. At the time of default, the contract had a total value of $1,215,489.79 and a completion date of January 31, 1985.

By letter dated April 3, 1985, Rodoni–Becker Company, Inc. (Rodoni–Becker), a construction contractor, which Reliance anticipated hiring to complete the project following the takeover, sent its "in-depth"

review of the project to Gerald R. Knecht, attorney for Reliance. In that review Rodoni–Becker reported that "[t]he status of the project appears deceptively further along than it actually is." The report estimated costs for completion of the project at $472,767.00. On April 5, 1985, Knecht responded to Rodoni–Becker's review, writing, "[t]his letter will constitute acceptance upon behalf of our client, Reliance Insurance Company, of your proposal dated April 3, 1985...." Thereafter, Reliance entered into a takeover agreement with the USDA on April 17, 1985 to complete the work on the Alameda project. This agreement named Rodoni–Becker as the agent/contractor for Reliance and stated that a completion date would be agreed upon later.

Following the completion of the project, Reliance submitted uncertified claims to the contracting officer in the following amounts:

| CLAIM NO. | DESCRIPTION | AMOUNT |
|---|---|---|
| 1 | Premature Payment | $315,211.00 |
| 2 | Fume Hood–Ductwork Connections | 8,549.24 |
| 3 | Fume Hood Exhaust Air Fans | 27,860.57 |
| 4 | Director's Office Ceiling | 1,040.20 |
| 5 | Extension of Time | |
| 7 | Reinforcing Duct Penetrations | 7,225.00 |
| 8 | Explosion Proof Fittings | 1,184.59 |
| 9 | Lower Ceiling in Room 17 | 974.00 |
| 10 | Damaged Air Deflectors | 2,340.00 |
| 11 | Boiler Feed Water Pump Controls | 645.00 |
| 12 | Freezer Start–Up/Repair | 1,833.15 |
| 13 | Extra Work—Phase I Heat Coil Piping | 2,545.87 |
| 14 | Acceleration of Air Balancing | 4,084.96 |
| 18 | Cleaning Catch Basins | 846.96 |
| 19 | Amsco Still Filter Work | 210.00 |
| 20 | Johnson Controls Work | 908.60 |
| 21 | Phase I Electrical Work | 9,952.80 |
| | TOTAL | $385,411.58 |

In addition to the above claims,[1] Reliance submitted an uncertified claim for bond exoneration in the amount of $253,006.13. Reliance asserted in this alternative claim that:

> the USDA pressured Reliance to quickly assume the completion of the project pursuant to its obligations under the performance bond, while misleading Reliance as to the actual status of completion of the project versus payment for completion and as to its ability and willingness to withhold $54,067.10 for Reliance Insurance's benefit. Either of those facts which were concealed by the USDA were sufficient to completely exonerate Reliance Insurance upon its performance

---

**1.** In the complaint filed with this court, the number of claims was reduced to twelve. Claim one in the complaint, the claim for alleged premature payment of contract funds to H.T. Engineers, and claim two in the complaint, Reliance's claim for bond exoneration, were allegedly certified subsequent to their original submission when, on August 21, 1986, Mr. H.H. Stebbins, associate vice president and bond claim manager of Reliance's Tacoma, Washington office signed the purported certification. Claims three through twelve of plaintiff's complaint are claims for alleged extra work denied by the contracting officer in his final decision, but were never certified.

bond, and pursuant to the terms of the Take–Over Agreement, Reliance is asserting exoneration of the bond at this time.

Reliance calculated the value of the bond exoneration claim in a table, as follows:

## CALCULATION OF CLAIM

CONTRACT PAYMENTS

| | |
|---|---:|
| Payments to Rodoni–Becker | $614,018.09 |
| * Owed to Rodoni–Becker | 41,646.31 |
| Payments to Others | 54,360.22 |
| **TOTAL PAYMENTS** | **$710,024.62** |

CONTRACT RECEIPTS

| | |
|---|---:|
| Progress Payment # 10 | $ 26,518.26 |
| Progress Payment # 11 | 125,099.46 |
| Progress Payment # 12 | 165,557.51 |
| Progress Payment # 13 | 89,843.26 |
| ** Final Payment | 50,000.00 |
| **TOTAL RECEIPTS** | **$457,018.49** |
| Payments | $710,024.62 |
| Receipts | - 457,018.49 |
| **TOTAL EXONERATION CLAIM** | **$253,006.13** |

\* Approximate at this time.
\*\* Payment assumed.

_____

The August 26, 1986 certification letter for claim one, overpayment to H.T. Engineering, and claim two, bond exoneration, explained that "the Certification of Claim of Reliance United Pacific with respect to the two claims in excess of $50,000," was enclosed and that "if the form is defective in any way, please notify this office immediately." The words of the certification executed on August 21, 1986 by H.H. Stebbins, Reliance's assistant vice president and bond claim manager, for claim one, alleged overpayment to H.T. Engineers for $315,211.00, and claim two, for bond exoneration in the amount of $253,006.13, reads:

With respect to the Alternative Claim for Bond Exoneration and Claim No. 1 based upon premature payment, I hereby certify that the claims are made in good faith, that the supporting data are accurate and complete to the best of Reliance Insurance Company's knowledge and belief, and that the amounts requested accurately reflect the contract adjustments for which the contractor believes the USDA is liable.

On October 10, 1986, the contracting officer issued a final decision denying plaintiff's claims. Thereafter, Reliance filed its complaint with this court. The following summarizes the claims alleged in plaintiff's complaint:

| CLAIM | | $ AMOUNT |
|---|---|---|
| 1 | Overpayment to the defaulted contractor H.T. Engineers | 315,210.00 |
| 2 | Bond Exoneration based on USDA's failure to inform/misrepresentations | 253,006.13 |
| 3 | Redesign, fabricate and install new duct work to correct defective drawings and specifications | 8,549.24 |
| 4 | Removal and replacement of fans to correct misdesignated discharge configurations | 27,860.57 |
| 5 | Cost for supply and installation of lights and sprinklers not reflected in the design drawings | 1,040.20 |
| 6 | Excusable delay in contract completion (Recoupment of liquidated damages withheld by USDA) | 6,105.00 |
| 7 | Cost of making duct penetrations and structural framing which were not completed under Phase I | 7,225.00 |
| 8 | Cost in installing explosion-proof electrical connections not reflected in the design drawings | 1,184.59 |
| 9 | 45% of the cost for replacing damaged air deflectors; liability for damage not established | 2,096.00 |
| 10 | Revision and reworking of Heat Coil piping erroneously installed in Phase I | 2,545.87 |
| 11 | Cost in attending meetings to trouble-shoot why the main exhaust fans did not work and to correct the defect | 908.00 |
| 12 | Cost of correcting and completing Phase I electrical work | 9,952.80 |

---

## DISCUSSION

### I. CLAIMS THREE THROUGH TWELVE

 Defendant filed a motion to dismiss claims three through twelve in plaintiff's complaint pursuant to RUSCC 12(b)(1).[2] On a motion to dismiss, "the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Nonetheless, the burden of establishing the jurisdiction of this court lies with the plaintiff, Reliance Insurance Corporation. *McNutt v. Gener-* *al Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936).

The court's subject matter jurisdiction in government contract cases has been defined, in part, by whether or not the certification of a claim filed with the contracting officer is validly executed under the pertinent statute, the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 601–613 (1988), and the implementing regulation contained in 48 C.F.R. § 33.207 (1988). The relevant portion of the CDA reads:

A contracting officer shall issue a decision on any submitted claim of $50,000 or less within sixty days from his receipt of

2. Following the enactment of the Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub.L. No. 102–572, the United States Claims Court was renamed the United States Court of Federal Claims. In accordance with General Order 33 issued by the United States Court of Federal Claims, the court adopted the rules of the United States Claims Court (RUSCC). The substance of the rules of the court are unaffected by the legislation, other than with respect to the name change of the court and, therefore, the name change of the rules. However, General Order 33 also indicates that if there is a conflict between the new statute and the rules, the statute will control.

a written request from the contractor that a decision be rendered within that period. For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

41 U.S.C. § 605(c)(1) (1988).

In the past, the statute has been strictly construed to hold that absent a proper certification no valid claim exists. *Ball, Ball & Brosamer, Inc. v. U.S.,* 878 F.2d 1426, 1428 (Fed.Cir.1989); *National Sur. Corp. v. United States,* 20 Cl.Ct. 407, 409–410 (1990). Stated otherwise, "unless [the] certification requirement is met, there is simply no claim that the court may review under the [Contracts Disputes] Act." *W.M. Schlosser Co. v. United States,* 705 F.2d 1336, 1338 (Fed.Cir.1983) (quoting *Paul E. Lehman v. United States,* 230 Ct.Cl. 11, 12, 673 F.2d 352, 355 (1982)). Certification of a claim in excess of $50,000 has been held to be jurisdictional, and a contractor's failure to certify a claim has resulted in the dismissal of its case for lack of jurisdiction. *Skelly & Loy v. United States,* 231 Ct.Cl. 370, 372, 685 F.2d 414, 417 (1982). The fact that the contracting officer has issued a final decision on the merits of the plaintiff's claims was not sufficient to waive the requirement for certification. *Skelly & Loy,* 231 Ct.Cl. at 372, 685 F.2d at 416 (citing *Paul E. Lehman,* 230 Ct.Cl. at 11, 673 F.2d at 356). In the past, a contractor was not able to cure a certification defect retroactively by attempting to certify the claim after the complaint has been filed in this court. *Skelly & Loy,* 231 Ct.Cl. at 372, 685 F.2d at 416 (citing *W.H. Moseley Co. v. United States,* 230 Ct.Cl. 405, 677 F.2d 850 (1982), *cert. denied,* 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982). *See also Troup Bros. v. United States,* 231 Ct.Cl. 707 (1982)).

On October 29, 1992, the President signed into law Public Law Number 102–572, which added some flexibility to the certification requirements by allowing government contractors to correct a defective certification without jeopardizing the jurisdiction before this court. However, the language of Public Law 102–572 is explicit in its application only to cases filed in this court following the enactment date of October 29, 1992. Section 907(a)(1)(B) of Pub.L. No. 102–572 amends 41 U.S.C. § 605(c) by inserting:

'(6) .... A defect in the certification of a claim shall not deprive a court or an agency board of contract appeals of jurisdiction over that claim. Prior to the entry of a final judgment by a court or a decision by an agency board of contract appeals, the court or agency board shall require a defective certification to be corrected.

(7) The certification required by paragraph. (1) may be executed by any person duly authorized to bind the contractor with respect to the claim.'

Section 907(a)(2) further states:

(2) The amendment made by paragraph (1)(B) shall be effective with respect to all claims filed before, on, or after the date of the enactment of this Act, except for those claims which, before such date of enactment, have been the subject of an appeal to an agency board of contract appeals or a suit in the United States Claims Court.

Pub.L. No. 102–572 § 907(a)(2) (1992). Unfortunately, for the plaintiff in the case at bar, the long overdue changes made by Pub.L. No. 102–572 provide no relief. The complaint at issue was clearly filed before October 29, 1992, and this case must be considered under the former certification rules.

In support of its lack of certification argument, defendant contends that claims three through twelve are derived from one common fact pattern, and actually comprise only one claim which, in the aggregate, totals more than $50,000.00 and, therefore, must be certified. The plaintiff, in response, alleges that each claim was separate and distinct, arose from differing facts and, therefore, did not require certification.

A single, unified claim based on a common and related set of facts cannot be fragmented for the purpose of avoiding the certification requirement. *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed.Cir.1990); *Warchol Constr. Co. v. United States*, 2 Cl.Ct. 384, 388–89 (1983). Therefore, if claims three through twelve constitute one claim, certification would be required. However, "the CDA recognizes that a single government contract may give rise to more than one claim, and that a contractor may pursue his rights by filing 'two or more suits' in either one or more fora." *Placeway Constr.*, 920 F.2d at 907 (citing 41 U.S.C. § 609 (1988)). In determining whether the claims presented are separate claims, the court must "assess whether or not the claims are based on a common or related set of operative facts." *Placeway Constr.*, 920 F.2d at 907.

In the instant case, therefore, this court must examine claims three through twelve of plaintiff's complaint to "determine whether they are separate and individual claims not requiring certification, or merely portions of a single, unified, 'claim' which, to be a valid claim, must be certified if amounting to more than $50,000 in the aggregate." *Walsky Constr. Co. v. United States*, 3 Cl.Ct. 615, 618 (1983) (citing *Warchol Constr.*, 2 Cl.Ct. at 389; *B.D. Click Co., Inc.*, ASBCA No. 25609, 81–2 BCA (CCH) ¶ 15,394, 76,263–64, 1981 WL 48288 (1981)). "In the context of the certification requirement, where the components of a unitary claim, *e.g.* differing site condition or erroneous survey, are so related to one another that they form parts of a whole, they ought to be considered together when determining whether certification is required." *Warchol Constr. Co. v. United States*, 2 Cl.Ct. at 389; *see also Walsky Constr. Co. v. United States*, 3 Cl.Ct. at 618.

After careful review of claims three through twelve, the court finds that although the claims cannot all be considered independent, they fall into two distinct categories, neither of which totals $50,000.00 or more.

*Design and Engineering Flaws*

This court finds that claims three, four, five and eight are based on common facts which require that they be considered a single claim. Each of these claims concern specific design or engineering flaws on the part of the USDA/FSIS. Claim three requests $8,549.24 for extra costs incurred by Reliance as a result of alleged defects in the drawings and specifications of the original designs for the duct work and exhaust air connections to the fume hoods. In claim four, Reliance seeks $27,860.57 for the cost of additional work caused by the allegedly, erroneous designation of centrifugal exhaust fans by USDA through its agent Chamberlain/Painter, Inc. Reliance states that because Chamberlain improperly designed certain exhaust fans to be bottom horizontal discharges, instead of up-blast discharges, these fans could not be installed because they would not perform their designated function. Claim five requests $1,040.20 for additional costs allegedly resulting from the USDA's failure to include the installation of sprinklers and lights in the revised drawings included with Change Order Six. Claim eight requests reimbursement for $1,184.59, incurred as a result of the allegedly deficient drawings which omitted the requirement for the installation of explosion-proof fume hoods and electrical connections.

In sum, claims three, four, five and eight arise from increased costs and work resulting from allegedly defective or inadequate design and/or engineering specifications on the project. Therefore, under the "closely connected facts" evaluation, these claims should be regarded as a single, unified claim for relief. The total prayer for relief of this claim, even aggregating claims three, four, five and eight, still only amounts to $38,634.00, which is less than the $50,000.00 threshold amount requiring certification under the CDA. Accordingly, Reliance was not required to certify this claim to the contracting officer.

*Defective Work from Phase I*

This court also finds that common facts form the basis for claims six, seven, ten and twelve, requiring that they be submit-

ted as a single claim. All of these claims arise from the defective or inadequate work performed on Phase I of the project (work completed before Reliance entered into the takeover agreement). Claim six is for $6,105.00 as an equitable adjustment of the contract completion date under the Delay Clause which resulted from extra work caused by defective and incomplete work performed in Phase I. The figure represents a claim for liquidated damages at the contract rate of $185.00 per day from the period of September 1, 1985 (the contract completion date) to October 4, 1985 (the project's actual completion). Reliance contends these funds were improperly withheld because it was the improper or unfinished Phase I work which resulted in the assessment of liquidated damages. Claim seven seeks $7,225.00 for extra work and expenses in making duct penetrations and constructing the structural framing therein which was supposed to be completed in Phase I. Claim ten represents $2,545.87 in expenses for revision and reinstallation of the heat coil piping installed on the north side of the site in rooms 24, 29 and 30 during Phase I. Finally, claim twelve requests $9,952.80 for the completion of electrical work which should have been performed by USDA's Phase I contractor. All of these claims in plaintiff's complaint deal with incomplete or faulty work performed under Phase I of the contract. Therefore, these claims should have been submitted as a single claim. Taken together, however, these claims total only $25,828.67, which does not require certification under the CDA.

*Individual Claims*

The remaining two claims, claims nine and eleven, do not fit neatly into either of the above categories. Reliance's claim nine is for $4,657.02, expended to replace air deflectors damaged by forklifts while in the government warehouse. While there is some dispute as to the origin of the damage, the claim appears to have arisen from a distinct set of facts. Thus, certification of this claim for $4,657.02 was not required. At the oral argument, counsel for the defendant, without conceding, reluc-

tantly agreed that claim nine would be the "clearest argument for a separate claim."

Finally, claim eleven represents a claim for $908.00, reimbursement for time spent in coordination meetings with the exhaust fan installation company. The purpose of the meetings was to trouble-shoot the main exhaust fans to determine why they did not function properly. The cause of the problems with the fans, and whether this claim arose because of design or engineering flaws or because of incomplete or defective Phase I work is not clearly presented in this record. However, adding this claim for $908.00 to either of the categories discussed above, design or engineering flaws, or defective Phase I work, does not increase the aggregated claim amount of either category above $50,000.00 in order to require certification.

At the oral argument, defendant alleged that a majority of the claims should be considered as a unitary claim because they all dealt with the exhaust system. However, this court is not persuaded. Based on a careful examination of the claims involved, this court finds that the "exhaust system" work is not the salient, operative fact giving rise to the claims. Although a number of the claims arguably relate to difficulties with exhaust system equipment at the laboratory, the underlying cause of the increased costs were not directly or tangentially related to the exhaust system. A more in-depth study shows that the claims resulted from either design flaws or earlier defective work at the laboratory. In *H.H.O. Co. v. United States*, this court found that six claims, all surrounding problems with the construction of a road "arose out of unrelated conduct and do not involve closely connected facts. Thus, it would be unreasonable to consider these claims unitary claims for certification purposes." *H.H.O. Co. v. United States*, 12 Cl.Ct. 147, 159 n. 4 (1987). Like *H.H.O.*, the facts underlying the various claims involved in the instant case can be considered distinct, even if a number of them pertain to the construction of the exhaust system.

In summary, the court finds that claims three, four, five and eight more properly

constitute a unified claim totalling $37,-634.60 arising out of a common set of operative facts, but still not requiring certification under the CDA. Furthermore, the court finds that claims six, seven, ten and twelve, totalling $25,828.67 arise out of common facts and do not require certification. Claim nine arises out of unique facts and, thus, does not require certification. Finally, claim eleven could conceivably be considered part of the claims three, four, five and eight package or part of the claim six, seven, ten and twelve group, but the addition of claim eleven to either group would not trigger the requirement for certification. Therefore, defendant's motion to dismiss claims three through twelve of plaintiff's complaint for lack of jurisdiction is denied.

## II. CLAIMS ONE AND TWO

Claims one and two of plaintiff's complaint are before the court on defendant's supplemental motion to dismiss, or, in the alternative, on defendant's original motion for summary judgment. Defendant's supplemental motion to dismiss alleges that H.H. Stebbins, assistant vice president and bond claim manager in Reliance's Federal Way (Tacoma), Washington office was not qualified to certify claims one and two on behalf of plaintiff Reliance.

The two categories of individuals entitled to certify a contractor's claim exceeding $50,000.00 are clearly described in 48 C.F.R. § 33.207(c)(2) (1986). This section reads:

If the contractor is not an individual, the certification shall be executed by—

(i) A senior company official in charge at the contractor's plant or location involved; or

(ii) An officer or general partner of the contractor having overall responsibility for the conduct of the contractor's affairs.

Plaintiff conceded, both in its opposition to defendant's supplemental motion to dismiss, and at the oral argument held on January 12, 1993, that Mr. Stebbins does not meet the criteria of 48 C.F.R. § 33.-207(c)(2)(ii). Therefore, the court need only decide if Mr. Hyland H. (H.H.) Stebbins, when he signed the certification in the case at bar, was "[a] senior company official in charge at the contractor's plant or location involved" pursuant to 48 C.F.R. § 33.-207(c)(2)(i). The United States Court of Appeals for the Federal Circuit has interpreted this regulation to require that the certifying senior company official have "both primary responsibility for the execution of the contract *and* a physical presence at the location of the primary contract activity." *United States v. Grumman Aerospace Corp.*, 927 F.2d 575, 580 (Fed. Cir.1991) (emphasis in original).

Defendant contends that Mr. Stebbins was not "in charge" of the contract at issue and, furthermore, that he cannot demonstrate a physical presence at the site. The evidence submitted by both plaintiff and defendant suggests that of all Reliance's employees, Mr. Stebbins may have been the one individual most "in charge" of the pertinent contract, and may have been, as regional assistant vice president and bond claim manager, a "senior company official." Defendant, however, points to the involvement of Mr. Terry Casey and Mr. Gerald Knecht as proof that Mr. Stebbins was not "in charge" of the contract. Although Mr. Casey, an independent broker, and Mr. Knecht, a private attorney, were not employees of Reliance, certainly the large role they played throughout plaintiff's dealings with defendant, may defeat the ability of Mr. Stebbins to assert that he was in charge of the operations of the contract at issue.

Defendant also contends that, "Mr. Stebbins did not work at the project site in Alameda, California," and, thus, cannot meet the requirements of 48 C.F.R. § 33.-207(c)(2)(i). Defendant alleges that "Mr. Stebbins worked in Reliance's office in Tacoma, Washington, but that the location of the 'primary contract activity' was the project site at the USDA/FSIS laboratory in Alameda, California. In fact, at least as far as the defendant is aware, Mr. Stebbins never even visited the project site." Plaintiff responds by claiming that Mr. Stebbins "made several trips to the San Francis-

co/Alameda area for meetings concerning this project." The court notes that the Federal Circuit has not clarified what is meant by "plant or location involved." Although cases subsequent to the *Grumman* opinion, issued in the United States Claims Court (now the United States Court of Federal Claims),[3] have suggested that the primary contract activity means the "job site," *see, e.g. National Sur. Corp.,* 20 Cl.Ct. at 411.

This court has expressed its discontent with the language and the previously rigid interpretations of the certification requirement which existed prior to the recent legislative change. *See Aleman Food Servs. v. United States,* 24 Cl.Ct. 345 (1991). Although the certification requirement quite properly was enacted to discourage the submission of fraudulent claims, *Paul E. Lehman, Inc.,* 230 Ct.Cl. at 14, 673 F.2d at 355, the evidence presented in the instant case gives no suggestion that Mr. Stebbins signed the claims to perpetrate fraud against the United States. Nonetheless, in the instant case application of the certification request must follow the old rules.

Mr. Stebbins was the Reliance official with the most knowledge of the contract and the day-to-day dealings at the USDA laboratory. The evidence of who was "in charge" for the plaintiff, however, is somewhat ambiguous. The record contains self-serving affidavits of Gerald Knecht, and of another attorney in Mr. Knecht's law firm, stating that Mr. Stebbins traveled to San Francisco to meet with individuals regarding the contract. However, within these same affidavits, the affiants also state that they have no personal knowledge of such trips. Moreover, according to the trip report prepared by Ken Huber, Mr. Stebbins was reported to have told the procurement officer to get in touch with Mr. Gerald Knecht (not Mr. Stebbins), as he is the "representative" of the bonding company,

Reliance. Additionally, the surety takeover agreement was signed "Surety, Reliance Insurance Company, by Gerald R. Knecht." The acceptance of Rodoni–Becker as the agent/contractor to complete the contract was signed by Knecht, and most, if not all, of the contract documents in the record which bear dates following the takeover by Reliance were addressed to "Reliance Insurance Co. c/o Mr. Gerald Knecht." The changes in Public Law 102–572 now provide that a certification "may be executed by any person duly authorized to bind the contractor with respect to the claim." For the case currently at bar, however, this court is bound to follow the prior law. Moreover, as is briefly discussed below, however, a review of the underlying claims shows that neither claim would survive defendant's original motion for summary judgment. Therefore, even if the plaintiff could document a valid certification in this case, plaintiff would still not prevail on the merits.

■ Plaintiff's first claim is for alleged overpayment by USDA to H.T. Engineers when USDA "was aware or should have been aware that H.T. had been paid substantially more under the contract than H.T. had earned.... That H.T.'s percentage of completion was substantially lower than the percentage of contract funds which had been paid by USDA to H.T." Specifically, plaintiff alleges in its opposition to defendant's motion for summary judgment that, "the government placed the total value of the work completed and material stored on site at $960,980.22, or 80% of the contract price." The plaintiff alleged that the job was only 51% complete, thus, *"roughly 30% of the contract, or $315,211* was not available to the surety, Reliance, because of the government's overpayment to the contractor ..." (emphasis in the original).[4]

3. Following the enactment of Pub.L. No. 102–572 (1992), the United States Claims Court was renamed the United States Court of Federal Claims.

4. The court notes that plaintiff's figures do not represent an accurate picture of the amount of alleged "overpayment." It is undisputed that at

the time of H.T. Engineers' default, the total projected amount of the contract was $1,215,-489.79. It is also clear that progress payments one through seven, totaling $810,815.13, were disbursed to H.T. Engineers before the default was declared. These payments represent 67% of the total contract price. Therefore, the al-

■ General Provision 7 of the contract at issue calls for the contracting officer to make progress payments as the work proceeds. "During performance of a contract, the Government has a vital interest in the contract's completion and, as such, its contracting officer is vested with broad discretion in administering the contract for the purpose of promoting performance." *United States Fidelity & Guaranty Co. v. United States,* 230 Ct.Cl. 355, 364, 676 F.2d 622 (1982) (citing *Argonaut Ins. Co. v. United States,* 193 Ct.Cl. 483, 493–94, 434 F.2d 1362, 1367–68 (1970)). Where the government is entitled to exercise its discretion and, therefore, deference is to be accorded its decisions, the " 'plaintiff has an unusually heavy burden of proof in showing that the determination made ... was arbitrary and capricious.' " *Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1164 (Fed.Cir. 1985) (quoting *Royal Indemnity Co. v. United States,* 208 Ct.Cl. 809, 529 F.2d 1312, 1320 (1976)).

The law in this area has become settled that so long as there is no showing of bad faith or an abuse of discretion, the decision of a Government contracting officer that a progress payment to a financially strapped contractor should not be withheld will be accorded deference by this court, and the surety's burden of proving to the contrary is high.

*United States Fidelity & Guaranty,* 676 F.2d at 628.

Plaintiff, in its opposition to defendant's motion for summary judgment, relies heavily on the eight-point test established in *Balboa Ins. Co. v. United States,* 775 F.2d at 1158. In this test, the *Balboa* court identified the following factors as "important" to determine whether the government has exercised reasonable discretion in its distribution of progress payments:

(1) Attempts by the Government after notification by the surety, to determine that the contractor had the capacity and intent to complete the job;

(2) Percentage of contract performance completed at the time of notification by the surety;

(3) Efforts of the Government to determine the progress made on the contract after notice by the surety;

(4) Whether the contract was subsequently completed by the contractor (not conclusive, but relevant to show the reasonableness of the contracting officer's determination of the progress of the project);

(5) Whether the payments to the contractor subsequently reached the subcontractors and materialmen ...;

(6) Whether the Government contracting agency had notice of problems with the contractor's performance previous to the surety's notification of default to the Government;

(7) Whether the Government's action violated one of its own statutes or regulations;

(8) Evidence that the contract could or could not be completed as quickly or cheaply by a successor contractor.

*Balboa Ins. Co. v. United States,* 775 F.2d at 1164–65 (citations omitted).

However, before applying the *Balboa* standards to determine whether the contracting officer abused his/her discretion, plaintiff must establish its right to collect funds from the government. "[T]he traditional means of asserting a surety's claim is under the equitable doctrine of subrogation." *Balboa Ins. Co. v. United States,* 775 F.2d at 1161. Following the decision in *Balboa,* the United States Court of Appeals for the Federal Circuit made it quite clear that notice by the surety to the government is a necessary first step to trigger the government's responsibility. Therefore, the eight point test in *Balboa* should be applied only if notice by the surety is given to the government. In the words of the Federal Circuit:

the government as obligee owes no equitable duty to a surety ... unless the surety notifies the government that the principal has defaulted under the bond. It is irrelevant whether the surety claims

leged overpayment, if it occurred, was actually around 15%.

a right to funds during the performance of the contract, or after it is completed when the government functions as a 'stakeholder' of funds owed but not yet paid. *In either event, notice by the surety is essential before any governmental duty exists.*

*Fireman's Fund Ins. Co. v. United States,* 909 F.2d 495, 498 (Fed.Cir.1990) (emphasis added). Stated otherwise, "before any obligation arises to withhold or divert funds, the Government must be notified that the sureties believe the contractor is in default and cannot complete the contract." *Ransom v. United States,* 17 Cl.Ct. 263, 272 (1989), *aff'd,* 900 F.2d 242 (Fed.Cir.1990). Strangely enough, plaintiff Reliance urges this court to apply the *Balboa,* eight point test to the facts of this case, yet the record shows no evidence that the required notice was given by the surety to the government in the instant case.

In fact, plaintiff alleges in its original opposition to defendant's motion for summary judgment that notification by the surety is not required. As support, plaintiff cites to two Claims Court cases, *United Pacific Ins. Co. v. United States,* 16 Cl.Ct. 555 (1989) and *U.S. Fidelity & Guar. Co. v. United States,* 16 Cl.Ct. 541 (1989). These two cases, although persuasive, are not binding on this court, and certainly cannot defeat the ruling of the United States Court of Appeals for the Federal Circuit that notice by the surety is a prerequisite to the existence of a governmental duty. *Fireman's Fund Ins. Co. v. United States,* 909 F.2d at 495.

Plaintiff also attempts to make what amounts to a constructive notice argument claiming that notice by Reliance was not necessary in the instant case because of the government's equitable obligation to the surety, coupled with its own inspections of the contract in progress and notices from subcontractors of problems on the job site. However, this argument is also unpersuasive. The United States Court of Appeals for the Federal Circuit addressed this issue in *Fireman's Fund Ins.,* 909 F.2d at 499. In that opinion, the Federal Circuit stated:

> That some subcontractors and suppliers had informed the government of Westech's payment deficiencies prior to release of the retainage does not substitute for notice by the surety and does not trigger the government's equitable duty to act with reasoned discretion toward it. Fireman's Fund simply cannot rely on Westech's subcontractors or the government to protect its interests. By definition and agreement the surety protects the government's interest, not the other way around.

*Id.* The circuit court went on to state: "[o]nly when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the government owe it any duty. The surety knows best when this may occur; consequently, only notice by the surety triggers the government's equitable duty." *Id.*[5] Moreover, "the Government has no legal obligation to suspend a progress payment merely upon the unsupported request of a Contractor's Surety." *Balboa*

5. In the declaration of contracting officer Kenneth Huber, submitted as part of defendant's appendix in its dispositive motions, Mr. Huber states that he had a conversation with Mr. Stebbins of Reliance on February 21, 1985, before the takeover agreement was signed, concerning the obligations of H.T. Engineers. However, Huber goes on to state that subsequent to the termination of H.T. Engineers on February 25, 1985, he had "no further conversations with Mr. Stebbins concerning the amount of contract funds. Neither did any agent or employee of Reliance ... determine the remaining amount of contract funds prior to executing the takeover agreement."

In its claim for bond exoneration, however, the plaintiff claims that on February 25, 1985,

which was only three days before the termination of H.T. Engineers, Mr. Stebbins wrote to Mr. Huber requesting the USDA to withhold further payments to H.T. Engineers in order to conserve monies under the contract for completion of the project. Also, in the bond exoneration claim, plaintiff alleges that prior to the termination, a representative of plaintiff, Terry Casey, requested the contracting officer not to grant progress payment # 8 for $54,067.10. In fact, the USDA did withhold progress payment # 8 and because H.T. Engineers was terminated very shortly after these conversations occurred and the letter from Stebbins was sent, no further progress payments were made to H.T. Engineers. Therefore, in essence, the government complied with plaintiff's requests to withhold.

*Ins. Co. v. United States,* 775 F.2d at 1164 (citing *United States Fidelity & Guaranty Co. v. United States,* 676 F.2d at 628). Consequently, even if the plaintiff's claim for overpayment by USDA to H.T. Engineers could survive the jurisdictional test regarding certification, plaintiff could not prevail on the merits of its claim.

Plaintiff's second, or alternative claim for bond exoneration is based on the USDA's alleged failure to inform Reliance of the unavailability of $54,067.10, which was ultimately withheld at the request of the Department of Labor to cover Davis–Bacon Act violations. Plaintiff claims that this constituted a "misrepresentation by the USDA to Reliance upon which Reliance relied to its detriment in executing the takeover agreement and completing H.T.'s work under the contract." Plaintiff claims that this misrepresentation operates to completely exonerate Reliance from its bond obligations.

 Misrepresentation by the government occurs when the government "fails to disclose information it has a duty to disclose." *John Massman Contracting Co. v. United States,* 23 Cl.Ct. 24, 31 (1991). "[W]here the government possesses special knowledge, not shared by the contractor, which is vital to the performance of the contract, the government has an affirmative duty to disclose such knowledge. It cannot remain silent with impunity." *Hardeman–Monier–Hutcherson v. United States,* 458 F.2d 1364, 1371–72, 198 Ct.Cl. 472, 487 (1972). Or otherwise stated, the government possesses "superior knowledge" when information which is vital to contract performance is known by the government, but not reasonably available to the contracting party. *Utility Contractors, Inc. v. United States,* 8 Cl.Ct. 42, 52 (1985), *aff'd,* 790 F.2d 90 (Fed.Cir.1986), *cert. denied,* 479 U.S. 827 (1986). Or, there is no duty to disclose information when the plaintiff has the same ability to obtain the information. *See L.G. Everist, Inc. v. United States,* 231 Ct.Cl. 1013, 1018–19 (1982), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); *Massman Contracting,* 23 Cl.Ct. at 32. If the party

claiming misrepresentation "knows or has the opportunity to learn the facts" of the alleged misrepresentation, that party is unable to prove that it was misled. *Vann v. United States,* 420 F.2d 968, 982, 190 Ct.Cl. 546, 571 (1970).

The court finds, based on the evidence presented, that Reliance had both actual knowledge of the Davis–Bacon Act withholdings and the opportunity to learn of the withholding pursuant to direction from the Department of Labor. First, although Reliance denies having knowledge, the record before the court establishes that Reliance had notice of the possibility of Davis–Bacon withholdings as of February 20, 1985. In a letter from Terry Casey to Pete Fjellstad at Reliance, dated February 20, 1985, the following language appears: "[t]here is one additional payment problem which may surface later. An ex-employee of H.T. Contractors & Engineers made a complaint to the Labor Department that he wasn't paid a prevailing wage." This letter was written five days before H.T. Engineers was defaulted, and almost two months before Reliance committed to completing the job and signed the takeover agreement. Moreover, the affidavit submitted by contracting officer Kenneth Huber states, "prior to executing the takeover agreement, no employee or agent of Reliance sought to inquire concerning any Davis–Bacon Act violations."

According to a selection from the deposition testimony of Kenneth Huber included in plaintiff's appendix, and a letter dated March 28, 1985, from the Department of Labor to the USDA, included in defendant's appendix, it appears that the Department of Labor actually requested the USDA to withhold the $46,267.67 pending final resolution of the Davis–Bacon Act violation investigation. Therefore, even if the February 20, 1985 letter to Reliance does not establish actual notice, Reliance certainly had the opportunity to learn of the outstanding Davis–Bacon violations. Moreover, the actual direction to withhold funds from the Department of Labor did not occur until after Reliance was alerted to the potential problem. Plaintiff does not allege that defendant maliciously hid infor-

mation or that defendant refused to respond to requests or inquiries from plaintiff regarding possible Davis–Bacon violations. Plaintiff's claim simply alleges that defendant had knowledge of the Davis–Bacon violations and did not inform Reliance before the takeover. When the original contractor is terminated, as stated in the default notice, for, among other reasons, "non-payment for supplies and services delivered and performed at the site," it seems only prudent business sense to explore possible obligations which might be attributed to the surety, following takeover, including payments to the Department of Labor for underpaid workers.

## CONCLUSION

The defendant's motion to dismiss claims three to twelve of plaintiff's complaint is DENIED and defendant's motion to dismiss claims one and two is GRANTED. Further proceedings in the above-captioned case will be scheduled in a separate order to be issued by the court.

IT IS SO ORDERED.